Nos. 20-55175, 20-55252

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GERARDO GONZALEZ, *et al.*,
Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
Appellants.

On Appeal from a Final Judgment and Permanent Injunction Issued by the
U.S. District Court for the Central District of California,
Civil Action No. 13-cv-04416-AB-FFMx

## APPELLANTS' PRINCIPAL BRIEF

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation, District Court Section

LAUREN C. BINGHAM
Senior Litigation Counsel

FRANCESCA GENOVA
ARCHITH RAMKUMAR
Trial Attorneys

EREZ REUVENI
Assistant Director
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-4293 | Fax: (202) 305-7000
Erez.r.reuveni@usdoj.gov

*Counsel for Appellants*

# TABLE OF CONTENTS

INTRODUCTION..........................................................................................1

STATEMENT OF JURISDICTION..................................................5

STATEMENT OF THE ISSUES ..........................................................6

PERTINENT STATUTES AND REGULATIONS..........................................7

STATEMENT OF THE CASE .......................................................................7

SUMMARY OF ARGUMENT....................................................................17

STANDARD OF REVIEW...........................................................................19

ARGUMENT....................................................................................................20

I.    The Permanent Injunctions Should Be Vacated in Full Because They Rest on Threshold Errors of Law............................................................20

    A.    Prospective Injunctive Relief Was Categorically Improper ........20

    B.    The Injunctions Should Be Vacated Because No Fourth Amendment Seizure Occurred. ....................................................25

II.   The State-Authority Injunction Rests on Serious Errors of Law..........28

III.  The Database Injunction Should be Vacated. ........................................31

IV.   Further Limits on Equitable Relief Warrant Vacating or Substantially Narrowing the Injunctions ...................................................................46

CONCLUSION ..............................................................................................51

CERTIFICATE OF SERVICE ....................................................................52

CERTIFICATE OF COMPLIANCE ..........................................................53

# TABLE OF AUTHORITIES

## CASE LAW

*Abel v. United States*,
  362 U.S. 217 (1960) ................................................................. 28

*Aguilar v. ICE*,
  510 F.3d 1 (1st Cir. 2007) .......................................................... 41

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................. 34

*Arizona v. United States*,
  567 U.S. 387 (2012) ...........................................................7, 8, 30

*Armas-Barranzuela v. Holder*,
  566 F. App'x 603 (9th Cir. 2014) ................................................... 42

*B.C. v. Plumas Unified School Dist.*,
  192 F.3d 1260 (9th Cir. 1999) ...................................................... 23

*Baker v. McCollan*,
  443 U.S. 137 (1979) ................................................................. 37

*Belleri v. United States*,
  No. 10-81527-CIV, 2012 WL 12892399 (S.D. Fla. Jan. 17, 2012) ................... 36

*Brower v. Cty. of Inyo*,
  489 U.S. 593 (1989) ...............................................3, 18, 25, 26, 27

*California v. Hodari D.*,
  499 U.S. 621 (1991) ................................................................. 26

*City of El Cenizo, Texas v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ...........................................28, 29, 30, 31

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...............................................2, 17, 21, 22, 47

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) ............................................................ 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................... 22

*Clark v. Suarez Martinez*,
543 U.S. 371 (2005) ........................................................................ 7

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................ 32

*Comm. for Immigrant Rights of Sonoma Cnty. v. Cnty. of Sonoma*,
644 F. Supp. 2d 1177 (N.D. Cal. 2009) ........................................ 48

*Cotzojay v. Holder*,
725 F.3d 172 (2d Cir. 2013) .......................................................... 42

*D.C. v. Wesby*,
138 S. Ct. 577 (2018) .................................................................... 45

*Douglas v. United States*,
796 F. Supp. 2d 1354 (M.D. Fla. 2011) ........................................ 37

*E. & J. Gallo Winery v. Andina Licores S.A.*,
446 F.3d 984 (9th Cir. 2006) ........................................................ 20

*Florida v. Harris*,
568 U.S. 237 (2013) ...........................................................33, 34, 43

*Fridley v. Horrighs*,
291 F.3d 867 (6th Cir. 2002) ........................................................ 37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ...................................................................... 20

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) .......................................................... 25

*Garcia v. Taylor,*
    40 F.3d 299 (9th Cir. 1994) .......................................................................... 25

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ...................................................................................... 27

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .................................................................................. 49

*Hamama v. Adducci,*
    912 F.3d 869 (6th Cir. 2018) .................................................................. 48, 49

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ................................................................... 35, 39

*Harris v. Roderick,*
    126 F.3d 1189 (9th Cir.1997) ....................................................................... 37

*Herring v. United States,*
    555 U.S. 135 (2009) ................................................................................... 5, 44

*Hodgers-Durgin v. de la Vina,*
    199 F.3d 1037 (9th Cir. 1999) ...................................................................... 21

*Hodgkins ex rel. Hodgkins v. Peterson,*
    355 F.3d 1048 (7th Cir. 2004) ...................................................................... 37

*Illinois v. Gates,*
    462 U.S. 213 (1983) ................................................................................... 5, 45

*Innovation Law Lab v. McAleenan,*
    924 F.3d 503 (9th Cir. 2019) ........................................................................ 47

*J.E.F.M. v. Lynch,*
    837 F.3d (9th Cir. 2016) ............................................................................... 40

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ...............................................................13, 40, 42, 47

*Jocks v. Tavernier*,
 316 F.3d 128 (2d Cir. 2003) ........................................................... 37

*Ker v. California*,
 374 U.S. 23 (1963) ................................................................. 29, 30

*Lewis v. Casey*,
 518 U.S. 343 (1996) ............................................................... 28, 50

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
 350 F.3d 1018 (9th Cir. 2003) ................................................. 22, 27

*Martinez-Medina v. Holder*,
 673 F.3d 1029 (9th Cir. 2011) ..................................... 3, 18, 29, 31

*Maryland v. Pringle*,
 540 U.S. 366 (2003) ............................................................... 33, 34

*Mayfield v. United States*,
 599 F.3d 964 (9th Cir. 2010) ........................................................ 21

*McLean v. Crabtree*,
 173 F.3d 1176 (9th Cir. 1998) ...................................................... 48

*Mendia v. Garcia*,
 768 F.3d 1009 (9th Cir. 2014) ...................................................... 25

*Mendoza v. United States Immigration & Customs Enforcement*,
 849 F.3d 408 (8th Cir. 2017) ........................................................ 29

*Meredith v. Oregon*,
 321 F.3d 807 (9th Cir. 2003) ........................................................ 32

*Morales v. Chadbourne*,
 793 F.3d 208 (1st Cir. 2015) ........................................................ 26

*Navellier v. Sletten*,
 262 F.3d 923 (9th Cir. 2001) ........................................................ 35

*Orhorhaghe v. INS,*
   38 F.3d 488 (9th Cir. 1994) ............................................................... 42

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ........................................................................... 23

*Padilla v. ICE,*
   953 F.3d 1134 (9th Cir. 2020) ..................................................... 48, 49

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ............................................................. 35

*Pinho v. Gonzales,*
   432 F.3d 193 (3d Cir. 2005) .............................................................. 42

*Pitts v. Terrible Herbst, Inc.,*
   653 F.3d 1081 (9th Cir. 2011) ........................................................... 38

*Portis v. City of Chicago,*
   613 F.3d 702 (7th Cir. 2010) ............................................................. 35

*Rajah v. Mukasey,*
   544 F.3d 427 (2d Cir. 2008) .............................................................. 42

*Reno v. Am.-Arab Anti-Discrimination Com.,*
   525 U.S. 471 (1999) ..................................................................... 40, 47

*Ricciuti v. New York City Transit Auth.,*
   124 F.3d 123 (2d Cir. 1997) .............................................................. 45

*Rockwell Int'l Corp. v. United States,*
   549 U.S. 457, (2007) ......................................................................... 20

*Rohde v. City of Roseburg,*
   137 F.3d 1142 (9th Cir. 1998) ...................................................... 39, 45

*Sanchez v. Labate,*
   564 F. App'x 371 (10th Cir. 2014) .................................................... 37

*Sanchez v. Sessions,*
    904 F.3d 643 (9th Cir. 2018) .......................................................... 42

*Santos v. Frederick Cty. Bd. of Comm'rs,*
    725 F.3d 451 (4th Cir. 2013) .......................................................... 30

*Santoyo v. United States,*
    No. 16-CV-855, 2017 WL 6033861 (W.D. Tex. Oct. 18, 2017) ................... 8, 48

*Scales v. INS,*
    232 F.3d 1159 (9th Cir. 2000) .................................................... 36, 45

*Sibron v. New York,*
    392 U.S. 40 (1968) ............................................................ 4, 19, 33, 43

*Sprint Telephony PCS, L.P. v. Cty. of San Diego,*
    543 F.3d 571 (9th Cir. 2008) .......................................................... 19

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ...................................................................... 49

*Ting v. AT&T,*
    319 F.3d 1126 (9th Cir. 2003) ........................................................ 19

*United States v. Alexander,*
    106 F.3d 874 (9th Cir. 1997) .......................................................... 25

*United States v. Arvizu,*
    534 U.S. 266 (2002) ................................................................ 33, 43

*United States v. Cortez,*
    449 U.S. 411 (1981) ...................................................................... 46

*United States v. Drayton,*
    536 U.S. 194 (2002) ................................................................ 32, 33

*United States v. Esquivel-Rios,*
    786 F.3d 1299 (10th Cir. 2015) ...................................................... 44

*United States v. Estrada-Lucas*,
   651 F.2d 1261 (9th Cir. 1980) ............................................23, 24, 25

*United States v. Jingles*,
   702 F.3d 494 (9th Cir. 2012) ........................................................ 23

*United States v. Miranda-Sotolongo*,
   827 F.3d 663 (7th Cir. 2016) ........................................................ 44

*United States v. Ortiz-Hernandez*,
   427 F.3d 567 (9th Cir. 2005) ........................................................ 43

*United States v. Ovando–Garzo*,
   752 F.3d 1161 (8th Cir. 2014) ...................................................... 31

*United States v. Ramirez*,
   473 F.3d 1026 (9th Cir. 2007) ...................................................... 29

*United States v. Santa*,
   180 F.3d 20 (2d Cir. 1999) ........................................................... 45

*Updike v. Multnomah Cty.*,
   870 F.3d 939 (9th Cir. 2017) ........................................................ 21

*Virginia v. Moore*,
   553 U.S. 164 (2008) ..........................................................3, 18, 28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................... 32, 43

*Weinstein v. City of Eugene*,
   337 F. App'x 700 (9th Cir. 2009) ................................................ 39

## STATUTES

8 U.S.C. § 1226....................................................................9, 29, 48

8 U.S.C. § 1226(a) ..................................................................... 7

8 U.S.C. § 1226(c)(1) ............................................................... 7

8 U.S.C. § 1229a(c)(3)(A) ...................................................... 37

8 U.S.C. § 1231 ..................................................................... 48

8 U.S.C. § 1231(a) ............................................................ 9, 29

8 U.S.C. § 1231(a)(1)(A) ........................................................ 7

8 U.S.C. § 1231(a)(2) .............................................................. 7

8 U.S.C. § 1252(b)(9) ........................................... 4, 13, 39, 41

8 U.S.C. § 1252(f)(1) .................................................. 6, 19, 47

8 U.S.C. § 1357 ................................................................... 48

8 U.S.C. § 1357(a)(1) .............................................................. 7

8 U.S.C. § 1357(a)(2) .............................................................. 7

8 U.S.C. § 1357(g) ................................................................. 8

8 U.S.C. § 1357(g)(1)-(9) ....................................................... 8

8 U.S.C. § 1357(g)(3) ............................................................. 8

8 U.S.C. § 1357(g)(10) ........................................................... 8

28 U.S.C. § 1291 ................................................................... 6

28 U.S.C. § 1331 ................................................................... 5

## FEDERAL REGULATIONS

8 C.F.R. § 236.1 ................................................................... 9

ix

8 C.F.R. § 241.2 ................................................................. 9

8 C.F.R. § 287.5 ................................................................. 9

8 C.F.R. § 287.7 ............................................................. 1, 48

8 C.F.R. § 287.7(a) .......................................................... 9, 40

8 C.F.R. § 287.7(d) ............................................................ 9

**FEDERAL RULES FOR APPELLATE PROCEDURE**

Fed. R. App. P. 4(A)(1)(B) ................................................. 6

Fed. R. App. P. 27 ............................................................. 53

**FEDERAL RULES FOR CIVIL PROCEDURE**

Fed. R. Civ. P. 23 .................................................. 4, 12, 19, 32-33, 43

**MISCELLANEOUS**

*U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report ("ICE Operations Report")*, https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf (last visited May 20, 2020) .............................................. 9, 42

*U.S. Immigration and Customs Enforcement, Form I-247A,* https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf. (last visited May 20, 2020) ................................................ 9

*U.S. Immigration and Customs Enforcement, ICE Policy No. 10074.2,* https://www.ice.gov/detainer-policy (last visited May 20, 2020) ................. 9, 47

# INTRODUCTION

The federal government possesses broad power over immigration, but enforcing the laws concerning removable aliens is a formidable challenge. To meet that challenge, the federal government works with state and local governments. These cooperative efforts are critical to enabling the federal government to identify and remove the hundreds of thousands of aliens who violate immigration laws each year, including many thousands convicted of serious crimes, an undertaking that fulfills the Executive Branch's responsibility to enforce the statutes Congress enacted and to protect public safety. The primary means of cooperation comes through immigration detainers—requests that state and local law-enforcement agencies both notify the Department of Homeland Security (DHS) that criminal aliens believed to be removable from the United States are scheduled for release and also facilitate their transfer to DHS. A detainer is based on Immigration and Customs Enforcement's (ICE) assessment—often based on records checks in federal databases—that probable cause exists to believe that the subject is a removable alien. 8 C.F.R. § 287.7. The federal government has relied on detainers across Administrations for years. In FY 2019 alone, ICE issued more than 165,000 detainers nationwide.

On February 6, 2020, on behalf of a certified class, ER 154-55, the district court in this case issued a permanent injunction that prohibits ICE from issuing thousands of detainers originating in the Central District of California to 47 States. *See* Judgment 1-6 (ER 5-10). The injunction rests on two rulings: (1) that ICE "violates the Fourth Amendment by issuing detainers to state and local law enforcement agen-

cies in states that do not expressly authorize civil immigration arrests in state statute," Op. 30 (ER 41; *see* ER 12-48); and (2) that ICE "violates the Fourth Amendment by relying on an unreliable set of databases to make probable cause determinations for its detainers," Op. 32. The court permanently enjoined ICE "from issuing detainers seeking the detention of [class] members to law enforcement agencies in states that lack state law permitting state and local law enforcement agencies to make civil immigration arrests based on civil immigration detainers only" (the "state-authority injunction") and from "issuing detainers to [class] members based solely on database searches that rely upon information from sources that lack sufficient indicia of reliability for a probable cause determination for removal" (the "database injunction"). Judgment 4.

The district court erred. The judgment rests on serious errors of law and the injunction undermines a critical tool of immigration enforcement. A motions panel of this Court already stayed that injunction in part. This Court should now vacate the judgment and injunction in full.

To start, the injunctions are based on threshold errors of law. Although plaintiffs allege only that they were subject to detainers *in the past*, the injunctions bar the issuance of a wide swath of detainers on a *prospective* basis. The district court had no legal basis to provide that relief because plaintiffs did not demonstrate a "real and immediate threat that the injury"—that they would be subject to detention premised on a detainer—"will be repeated." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-08 (1983). The court thus erred in issuing class-wide prospective injunctive relief. Op. 36-37; Judgment 1-6. The district court similarly erred in concluding any

named plaintiff was subjected to a Fourth Amendment seizure. Op. 28-36; Judgment 3-4. The court apparently believed that the mere issuance of a detainer by ICE to a state official amounts to a seizure, Op. 30, but a detainer is only a request. A Fourth Amendment seizure requires government-caused "detention [that is] willful," and that results in the "intentional acquisition of physical control" by the government, *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989). So there can be no seizure if no actual *new detention* based on a detainer occurs, and plaintiffs do not allege that any such new detention ever occurred in this case. The district court therefore erred in issuing the state-authority and database injunctions—both of which rely entirely on the Fourth Amendment—because no Fourth Amendment violation sufficient to support those injunctions is present in this case. Op. 28-36; Judgment 3-4. Those significant legal errors alone suffice to vacate the judgment below.

Apart from those threshold errors, the district court was wrong to issue the state-authority injunction based on its conclusion that "ICE violates the Fourth Amendment by issuing detainers to state and local law enforcement agencies in States that do not expressly authorize civil immigration arrests in state statute." Op. 29-30. "The Fourth Amendment's meaning" does not depend on "statutory constraints [on] state officers." *Virginia v. Moore*, 553 U.S. 164, 176 (2008). If a seizure is reasonable when a federal officer effectuates it—as arrests by ICE officers are— then so too when a state or local officer effects a seizure based on the same probable-cause determination, even where state law does not authorize the arrest. *See Martinez-Medina v. Holder*, 673 F.3d 1029, 1037 (9th Cir. 2011).

Also apart from the threshold errors described above, the district court erred in certifying the Probable Cause Subclass with the one named plaintiff—Gonzalez—as its representative, and issuing the database injunction on its behalf. Gonzalez is a citizen, and therefore the detainer issued to him was in error, but the class the district court certified is not limited to citizens, and extends to "all current and future _persons, ..._ subject to an immigration detainer issued by an ICE agent located in the Central District of California ... issued solely on the basis of electronic database checks." ER 154-55 (emphasis added). But whether ICE has probable cause to issue a detainer to a specific individual is "pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." _Sibron v. New York_, 392 U.S. 40, 59 (1968). What is reasonable as to Gonzalez will differ categorically from what is reasonable as to aliens, and will further differ among alien class-members case-by-case, such that the district court erred in concluding that plaintiffs had demonstrated commonality, typicality, or adequacy under Rule 23(a). And, critically, unlike citizens, _aliens_ must raise any challenges, including constitutional challenges, "arising from any action taken ... to remove an alien from the United States," in their removal proceedings, 8 U.S.C. § 1252(b)(9), such that _citizens_, who are not subject to removal proceedings, may not serve as adequate class representatives for such aliens.

Beyond these class-certification errors, the district court erred further in concluding that "the databases used by ICE" to make probable-cause determinations on removability, individually or in any combination, _categorically_ "do not sufficiently

establish probable cause of removal." Op. 33; Judgment 3. The court based that conclusion on the view that the relevant databases "provide static, often outdated, information," and "provide[] no information on derivative citizenship," such that detainers could be issued erroneously to citizens. Op. 32-33; Judgment 3-4. The court focused on evidence of error rates involving a government report from 1995 and ICE's database practices in 2015-2016, yet the court deemed ICE's significantly different and more elaborate database practices in 2019 categorically unreliable based on that evidence. That was clear error. That evidence—which indicated that less than 0.5% of all detainers issued in 2015-2016 involved individuals ultimately found to be U.S. citizens—does not come close to the "routine or widespread" database errors that might render a law enforcement agency's reliance on databases categorically unreasonable for Fourth Amendment purposes. *See Herring v. United States*, 555 U.S. 135, 146-47 (2009). And the court's apparent conclusion that only in-person interviews of aliens was sufficiently reliable to permit reliance on database searches, Judgement 1, is the sort of "[r]igid legal rule [] ill-suited" to the probable-cause context. *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Finally, even if the district court had been right to rule for the plaintiffs on any merits questions, the injunction was inappropriate and should at least be substantially narrowed. The injunction irreparably harms the United States' ability to enforce the immigration laws and to remove dangerous criminal aliens. At the least, the injunction is vastly overbroad, exceeding statutory limits on equitable relief and extending beyond the actual claims pleaded and the evidence presented at trial, and should be substantially narrowed.

## STATEMENT OF JURIDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. On February 5, 2020, the district court issued a final judgment. Judgement 1-6. The government filed a timely notice of appeal. ER 2-3; *see* Fed. R. App. P. 4(A)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented in this appeal are as follows:

I.      Whether the district court erred in permanently enjoining ICE's longstanding practice of issuing immigration detainers based on electronic database checks and ICE's authority to issue detainers to state and local law enforcement agencies in States that do not expressly authorize civil immigration arrests in state statute where the named plaintiff lacked standing to seek prospective injunctive relief and was never subject to a Fourth Amendment seizure.

II.     Whether the court erred in issuing the state-authority injunction where ICE does not violate the Fourth Amendment by issuing detainers to state and local law enforcement agencies in states that do not expressly authorize civil immigration arrests in state statute.

III.    Whether the court erred in certifying the Probable Cause Subclass with Gonzalez as its representative and issuing the database injunction where ICE's database practices do not categorically, in all circumstances and for all individuals, fail to establish probable cause of removability.

IV.     Whether the injunctions are otherwise overbroad and should be substantially narrowed, where considerations of irreparable injury and the balance of

harms favor the government, where the class-wide injunctions are barred by 8 U.S.C. § 1252(f)(1), and where they provide relief beyond what is needed to remedy the injuries alleged on behalf of the Probable Cause Subclass in the operative complaint.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

***Legal Background.*** The federal government has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). This includes authority to interview, arrest, and detain removable aliens. *See* 8 U.S.C. § 1226(a) (Secretary of Homeland Security may issue administrative arrest warrants and arrest and detain aliens pending removal decision); *id.* § 1226(c)(1) (Secretary "shall take into custody" aliens who have committed certain crimes when "released"); *id.* § 1231(a)(1)(A), (2) (Secretary may detain and remove aliens ordered removed); *id.* § 1357(a)(1), (2) (authorizing certain warrantless interrogations and arrests).[1]

Although the federal government possesses broad power over immigration, enforcing the laws on removable aliens is a formidable challenge. To meet that challenge, the federal government works with state and local governments. These cooperative efforts are critical to enabling the federal government to identify and remove

---

[1] Following the Homeland Security Act of 2002, many references in the Immigration and Nationality Act (INA) to the "Attorney General" are now read to mean the Secretary. *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

the hundreds of thousands of aliens who violate immigration laws each year, including many thousands convicted of serious criminal offenses.

Federal law contemplates and authorizes these cooperative efforts. Congress has authorized DHS to enter into cooperative agreements with States and localities. *See* 8 U.S.C. § 1357(g). Under these agreements, trained and qualified state and local officers may, "subject to the direction and supervision of the [Secretary]," *id.* § 1357(g)(3), perform specified immigration enforcement functions relating to investigating, apprehending, and detaining aliens. *Id.* § 1357(g)(1)-(9). Even without a formal agreement, state and local officers may "communicate with the [Secretary] regarding the immigration status of any individual" or "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," *id.* § 1357(g)(10), when that cooperation is pursuant to a "request, approval, or other instruction from the Federal Government," *Arizona*, 567 U.S. at 410. Permissible cooperation includes "arrest[ing] an alien for being removable" and "responding to requests for information about when an alien will be released from their custody." *Id.*

In exercising its arrest and detention authorities, ICE, a component of DHS responsible for immigration enforcement in the interior of the country, has for decades[2] relied on immigration detainers to seek state and local assistance in removing from the United States the tens of thousands of aliens arrested for or convicted of crimes annually. A detainer asks a State or locality to: (1) notify ICE of the alien's

_____

[2] The government's use of immigration detainers "predates the INA." *Santoyo v. United States*, No. 16-CV-855, 2017 WL 6033861, *3 (W.D. Tex. Oct. 18, 2017).

release date from local custody; and (2) detain an alien for up to 48 hours beyond when the alien would be released on state charges, based on ICE's determination that it has probable cause to believe that the alien is removable, so that ICE can take custody of the alien in an orderly custodial setting rather than in the community. 8 C.F.R. § 287.7(a), (d); ICE Policy No. 10074.2 ¶ 2.7, *at* https://www.ice.gov/detainer-policy. A detainer is based on ICE's determination, set forth on an immigration detainer form, that probable cause exists to believe that the subject is a removable alien based upon: (1) a final order of removal; (2) the pendency of removal proceedings; (3) biometric confirmation of the alien's identity and a records match in federal databases that indicate that the alien either lacks lawful immigration status or, despite such status, is removable; or (4) the alien's voluntary statements to an immigration officer, or other reliable evidence of the same. Form I-247A at 1, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf. As of April 2, 2017, ICE detainers must be accompanied by a signed administrative warrant of arrest issued under 8 U.S.C. §§ 1226 or 1231(a), and may be issued only to aliens arrested for criminal offenses. *See* ICE Policy No. 10074.2 ¶¶ 2.4-2.6. That arrest warrant is issued by an executive officer and sets forth the basis for that officer's probable-cause determination. *See* 8 C.F.R. §§ 236.1, 241.2, 287.5.

During fiscal year 2019, ICE would issue nearly 50,000 detainers from the PERC, *see* ER 250, including to many thousands of serious, violent offenders. *See* U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report ("ICE Operations Report") 16,

https://www.ice.gov/sites/default/files/docments/Docment/2019/eroReportFY2019 .pdf.

*Procedural Background.* In 2013 plaintiffs filed this lawsuit, initially assigned to Judge Beverly O'Connell, alleging ICE's issuance of immigration detainers in the Central District of California, through the Pacific Enforcement Response Center (PERC), violated the Fourth Amendment. The PERC issues detainers 24 hours a day to persons in the Central District of California and after-hours to federal, state, and local law enforcement in 42 States and 2 U.S. territories. Op. 4. The operative, third amended complaint, alleges, on behalf of two named plaintiffs—Gerardo Gonzalez and Simon Chinivizyan—and a putative class, that (1) ICE's "policy of issuing detainers without providing a prompt judicial probable cause determination violates the Fourth Amendment," ER 866 ¶¶ 112-13 (third amended complaint), and (2) ICE's practice of issuing database-based detainers from the PERC based solely on the use of four electronic databases violated the Fourth Amendment, ER 850-51, 865 ¶¶ 35-37, 107, because these databases are "inaccurate and incomplete," ER 712; *see* ER 711-17. Although neither Gonzalez nor Chinivizyan was ever detained as a result of a detainer, ER 857, 860 ¶¶ 69, 85; ER 61, they alleged that they remained in local custody because of a detainer, ER 844 ¶¶ 12, 14, and Gonzalez separately alleged that, although he is a U.S. citizen, the Los Angeles Police Department (LAPD) "incorrectly wrote on [his] booking record that he was born in Mexico." ER 856 ¶ 61; *see* ER 55, 390, 393, 506. Plaintiffs sought, among other things, two types of injunctive relief: retrospective relief—"rescission of any immigration detainers

issued against plaintiffs and members of the proposed class," and prospective relief—"enjoining Defendants ... from requesting detention on an immigration detainer." ER 194.

On September 15, 2014, the district court dismissed all claims seeking prospective relief, holding that plaintiffs failed—as they had in prior complaints—to allege facts showing a "reasonable likelihood of future injury" and "substantial likelihood that the relief sought would redress the injury." ER 193-94. The court reasoned that the named plaintiffs "had already been [issued] a detainer when they initiated this action" and were not reasonably likely to be subject to detainer requests again. ER 192-94. The Court afforded plaintiffs "one final opportunity"—beyond the multiple opportunities they had already had—"to amend this prayer for relief," cautioning that "[i]f Plaintiffs fail to do so, Plaintiffs' requests for prospective relief will be denied with prejudice." ER 194. On November 7, 2014, plaintiffs filed a Notice stating that they did "not intend to amend their complaint." ER 800 (Dkt. 63).

On September 9, 2016, the district court certified two classes. ER 143-84. First, the court certified a class (the "Judicial Determination Class") with both Gonzalez and Chinivizyan as representatives, alleging that "ICE's practice of failing to provide a judicial determination of probable cause at any point while an individual is held in ICE custody" violates the Fourth Amendment. ER 168. That class consists of "all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is

not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings," "limited to those detained for more than 48 hours." ER 14-15 n.1; *see* ER 154-55, 168-69.

Second, the district court certified a subclass (the "Probable Cause Subclass"), consisting of "everyone in the Judicial Determination Class whose detainer was issued solely on the basis of [] government database checks," ER 162, represented solely by Gonzalez, ER 14 n.1, defined as "all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and the detainer was issued solely on the basis of electronic database checks." ER 154-55, 162. The court reasoned that such a class satisfied the "commonality" requirement because the class challenged ICE's "alleged practice of basing probable cause only on information contained in an online database, rather than through in-person interviews or determinations," and so "individual determinations of whether ICE had probable cause as to any given individual is unnecessary." ER 169. The court also concluded that Gonzalez's claims were "typical" of the class, and that Gonzalez would adequately represent the class, because his "claims allege that the practice of relying on an electronic database for establishing probable cause is unlawful," and regardless of his citizenship or other circumstances, his possible "detainment based on the flawed information in the database makes him typical of the class." ER 171-73. And the court concluded that plaintiffs satisfied Rule 23(b)(2) because "the policies challenged equally affect[] all members of the class," a final

decision would "apply to all class members," and "even though the Gonzalez Defendants present evidence indicating that ICE has effectively changed its policy, the Court finds that this is not enough to render the Gonzalez Plaintiffs' claims moot." ER 183.

Thereafter, Judge O'Connell passed away. The case was reassigned to Judge André Birotte Jr. *See* ER 686, 688.

Thereafter, the government moved to dismiss the Probable Cause Subclass's claim for lack of subject-matter jurisdiction. ER 94. The government argued that plaintiffs' claims were barred by 8 U.S.C. § 1252(b)(9), which provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" shall be available exclusively in the courts of appeal through a petition for review following an alien's removal proceedings in immigration court. Dkt. 239 at 11. The government contended that because "Plaintiffs' challenge to the detainer process—in which ICE seeks to detain individuals ... to proceed with their removal" "'arise[s] from an[] action taken or proceeding brought to remove [them] from the United States.'" *Id*. On February 7, 2018, the district court denied the motion, ER 94-141, reasoning that Gonzalez was "not subject to ongoing removal proceedings at the time that ICE issued detainers against [him]," and his claims "relate to the ICE officers' actions before removal proceedings were filed," such that his claims "are independent of the removal process." ER 123-24. The court also reasoned that "many of the class members, while subject to detainers, were or are never placed in removal proceedings," such that if

section 1252(b)(9) barred their claim, "it would be tantamount to denial of judicial review." ER 124. The government moved to reconsider, relying on the plurality decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), which the government argued suggested that section 1252(b)(9) precluded district court jurisdiction over "challeng[es to] the decision to detain [aliens] in the first place or to seek removal," *Jennings*, 138 S. Ct. at 841. The district court denied the motion, concluding that the *Jennings* plurality found jurisdiction notwithstanding section 1252(b)(9), ER 91-92, and that regardless, "many of the class members, while subject to detainers, were or are never placed in removal proceedings," such that section 1252(b)(9) cannot apply. ER 92.

In May 2019, the district court conducted a seven-day trial on the database claim. ER 234-35, 240-41, 247-48, 252-53, 255-56, 374-75, 379-80. Shortly before trial, over the government's objection, the court allowed plaintiffs to raise a claim—never pleaded in the operative complaint, *see* ER 840-82—that ICE violates the Fourth Amendment by issuing detainers in States that lack affirmative statutory authority authorizing arrests based on civil immigration offenses. ER 79, 382 (Tr. 78:19-22), 607-08.

At trial, the district court heard evidence on the "four databases" that the complaint challenged. That evidence showed that as of 1995 one of those databases was "incomplete or inaccurate," and that from May 5, 2015, to February 22, 2016, of the 12,797 detainers issued from the PERC, 120 detainers were withdrawn, less than half of which involved individuals ultimately found to be U.S. citizens. ER 243-45 (Tr. 1465:21-1467:1), 377. Plaintiffs presented a witness who speculated that this

might be under-representative, ER 237-378 (Tr. 1625:3-1626:7), but did not submit evidence to that effect. The court also heard evidence on the significant changes to ICE's database practices that occurred in 2017 and 2018, including ICE's new "AC-RIMe Field," which enables ICE to check 10 databases, by way of fingerprint matches (with a false-accuracy rate of between 0.006% and 0.0097% (ER 568 at 67:13-20)), before issuing a detainer; how given ICE's new database practices, "the half a percent lift rate for" detainers issued to U.S. citizens would be "significantly lower today," ER 244 (Tr. 1466:22-23); and how, as of November 2018, ICE queried more than 30 databases, including databases managed by DHS and its sub-components, the Department of State, the FBI, and DOJ, containing, among other things, information on visa applications, asylum applications, applications for entries or exits from the United States, and criminality. ER 511.

On September 27, 2019, the district court issued its factual findings and legal conclusions. Op. 1-37. It made two key rulings. *First*, the court concluded that ICE "violates the Fourth Amendment by issuing detainers to state and local law enforcement agencies in states that do not expressly authorize civil immigration arrests in state statute." Op. 30; *see* Op 28-30. The court reasoned that "under the Fourth Amendment," if federal law does not authorize a state arrest, "the lawfulness of arrests for federal offenses is to be determined by reference to state law," Op. 29, and neither "federal law" nor "a detainer itself provide[s] the legal authority for a state or local officer to make a civil immigration arrest." Op. 30. An arrest under a detainer thus must, the district court believed, be "expressly authorize[d]" by "state statute" to be legal. *Id.* So, the court held, "ICE violates the Fourth Amendment by issuing

detainers to state and local law enforcement agencies" in States that do not provide such authorization. *Id*.

*Second*, the district court held that ICE "violates the Fourth Amendment by relying on an unreliable set of databases to make probable cause determinations for its detainers." Op 32; *see* Op. 32-37. The court relied on the evidence submitted about ICE's database practices in 2015-2016, yet concluded that the databases on which ICE relied as of the trial in 2019—at least 30 operated by DHS or other law enforcement agencies, Op. 33—are unreliable because they "provide static, often outdated, information," they may be "incomplete," and in some cases they were "never intended to be used to make probable cause determinations in the immigration context." Op. 32. Thus, the court concluded, absent "additional checks," ICE's reliance on its current databases to assess probable cause violated the Fourth Amendment. Op. 32-35. The court concluded that a permanent injunction was warranted. Op. 36-37.

The parties submitted proposed judgments. The government's proposal noted that the court had previously held that plaintiffs "fail[ed] to establish ... standing to seek prospective injunctive relief." Dkt. 560 (quoting ER 192-93).

On February 6, 2020, the district court issued its final judgment and permanent injunction. Judgment 1-6. Without addressing the standing issue identified by the government, the court permanently enjoined ICE "from issuing detainers seeking the detention of Probable Cause Subclass members to law enforcement agencies in states that lack state law permitting state and local law enforcement agencies to make

civil immigration arrests based on civil immigration detainers only" (the "state-authority injunction") and from "issuing detainers to Probable Cause Subclass members based solely on database searches that rely upon information from sources that lack sufficient indicia of reliability for a probable cause determination for removal," (the "database injunction"). Judgment 4. And the court suggested that the only reliable source of information concerning an alien's citizenship is an in-person interview. *Id.* at 1.

The government filed with this Court an emergency motion for a stay of the judgment and permanent injunction pending appeal. On March 2, 2020, a motions panel granted a stay "as to that portion of the order enjoining Immigration and Customs Enforcement from 'issuing detainers seeking the detention of Probable Cause Subclass members to law enforcement agencies in states that lack state law permitting state and local law enforcement agencies to make civil immigration arrests based on civil immigration detainers only,'" but otherwise denied the stay request. Stay Op. 2.

## SUMMARY OF THE ARGUMENT

The Court should vacate the permanent injunction in this case, decertify the Probable Cause Subclass, and remand with instructions to dismiss. The final judgment and injunction rest on serious errors of law and would cause serious disruption to the Executive's ability to enforce the immigration laws adopted by Congress.

I.A.   The district court lacked jurisdiction to issue prospective injunctive relief. No named plaintiff demonstrated a "real and immediate threat" that they might

be subject to an immigration detainer in the future. Under a straightforward application of *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the plaintiffs lack standing to receive the prospective relief the district court awarded.

B.     Plaintiffs' claims also fail at the threshold because they fail to allege a Fourth Amendment seizure. *See* Op. 28-36; Judgment 3-4. Plaintiffs allege that they were subject to detainers, but a detainer is not a seizure; it is a request.  A Fourth Amendment seizure requires government-caused "detention [that is] willful," and that results in the "intentional acquisition of physical control" by the government, *Brower*, 489 U.S. at 596-97, so there can be no seizure if no actual *new detention* based on a detainer occurs, and no such new detention occurred here. The district court therefore erred in concluding that ICE violates the Fourth Amendment by issuing detainers to aliens in States lacking affirmative statutory authority permitting civil immigration arrests by state officers or by relying on databases to do so. Op. 28-36; Judgment 3-4.  That is sufficient to vacate the decision below.

II.     The district court further erred in issuing the state-authority injunction because it wrongly concluded that "ICE violates the Fourth Amendment by issuing detainers to state and local law enforcement agencies in States that do not expressly authorize civil immigration arrests in state statute." Op. 29-30. "The Fourth Amendment's meaning" does not depend on "statutory constraints [on] state officers." *Moore*, 553 U.S. at 176. So if a seizure is reasonable under the Fourth Amendment when a federal officer effectuates it—as arrests by ICE officers are—then a seizure is also reasonable under the Fourth Amendment when a state or local officer effects a seizure based on the same probable-cause determination, even where state law does

not authorize the arrest. *See Martinez-Medina*, 673 F.3d at 1037.

III.    With respect to the database injunction, the district court erred in certifying the Probable Cause Subclass with the one named plaintiff—Gonzalez—as its representative. Gonzalez, a citizen, raises fundamentally different Fourth Amendment claims than non-citizen members of the class he represents, and so the plaintiffs do not satisfy the commonality, typicality, and adequacy requirements of Rule 23(a) for their database claims. And because whether ICE has probable cause to issue a detainer to a specific individual is "pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." *Sibron v. New York*, 392 U.S. 40, 59 (1968), the Probable Cause Subclass does not satisfy Rule 23(b)(2). In any event, even if class certification was appropriate, the court's conclusion that "the databases used by ICE" to make probable-cause determinations on removability, individually or in any combination, *categorically* "do not sufficiently establish probable cause of removal," Op. 33; Judgment 3, was both legally and factually erroneous.

IV.    At the least, the injunctions are vastly overbroad. Considerations of irreparable injury and the balance of harms favor the government, the class-wide injunctions are barred by 8 U.S.C. § 1252(f)(1), and the injunctions flout Article III by providing relief beyond what is needed to remedy the injuries alleged on behalf of the Probable Cause Subclass in the operative complaint.

## STANDARD OF REVIEW

The grant of a permanent injunction is reviewed for abuse of discretion, but determinations underlying the final decision are reviewed "by the standard that applies to that determination." *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 575 (9th Cir. 2008). "[F]actual findings [are reviewed] under the clearly erroneous standard." and "question[s] of law [are] subject to *de novo* review." *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). A "district court abuses its discretion when it makes an error of law." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006).

## ARGUMENT

This Court should vacate the final judgment and permanent injunctions. The judgment rests on serious legal errors, considerations of harm and the equities favor the government, and the injunction is overbroad in any event.

## I. The Permanent Injunctions Should Be Vacated in Full Because They Rest on Threshold Errors of Law.

The district court erred in issuing the injunctions. Plaintiffs lacked standing to seek injunctive relief, no Fourth Amendment seizure of any named plaintiff occurred, and both the state-authority and database injunctions conflict with controlling precedent.

### A. Prospective Injunctive Relief Was Categorically Improper.

***Gonzalez Lacks Standing to Seek Prospective Injunctive Relief.*** The district court erred in issuing prospective injunctive relief to the Probable Cause Subclass

because the sole named plaintiff, Gonzalez, lacked standing to seek such relief. Article III "[s]tanding is not dispensed in gross": "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). And standing is assessed as of the date of the operative complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) ("when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction"). And a plaintiff seeking *prospective* relief must show more than Article III standing to challenge *past* injuries; he must demonstrate at the time of the operative complaint a "real and immediate threat that the injury will be repeated." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-08 (1983); *see also Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) ("a plaintiff who has standing to seek damages for a past injury, or injunctive relief for an ongoing injury, does not necessarily have standing to seek prospective relief").

As the district court itself previously recognized when addressing the third (and operative) amended complaint, Gonzalez alleged only that he was subject to a detainer in the past; he proffered no "facts demonstrating a likelihood of future injury." ER 193. Rather, he speculated that although he was not in state criminal custody and was never detained because of a detainer, he "could be taken into ICE's physical custody and detained for 2 more days" in the future if arrested again. *Id*. That theory is irreconcilable with the Supreme Court's decision in *Lyons*, which requires not just "past wrongs," but a showing of a "real and immediate threat" of future injury. 461 U.S. at 107-08. Such "contingent future events" do not permit

prospective injunctive relief, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999), because they fail to demonstrate that the alleged injury is likely to "be repeated," "which is necessary for standing to seek injunctive relief." *Updike v. Multnomah Cty.*, 870 F.3d 939, 946-47 (9th Cir. 2017); *see Lyons*, 461 U.S. at 107-08. Gonzalez thus lacks standing to seek prospective injunctive relief. And because Gonzalez "lacks standing," he "cannot represent others who may have such a claim," and "the district court's certification of the class with [Gonzalez] as its representative must be vacated." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).

In district court, plaintiffs contended that Gonzalez has standing because when he joined the suit he was "prevented" from "posting bail due to a detainer," so his detention allegedly caused by a detainer was either ongoing or imminent. ER 844 ¶¶ 12, 14. This argument fails. "Past wrongs do not in themselves amount to that real and immediate threat of injury" necessary for prospective relief. *Lyons*, 461 U.S. at 103. What matters is whether there is a "real and immediate threat that the injury will be repeated." *Id.* at 107-08. Gonzalez concedes that at the time of the operative complaint, he was not in criminal custody, let alone subject to a detainer. ER 840-82 (third amended complaint), ER 857 ¶ 69 (Gonzalez); *see* ER 844-45, 855-60 ¶¶ 11-14, 57-85. So even if Gonzalez "had already been subjected to a detainer when [he] initiated this action," he could only speculate that he "*could* be taken" into custody again because of a detainer. ER 193, 195-96 (emphasis added). And that could happen only if Gonzalez is *arrested* on state charges again, issued a new detainer,

and then detained by a State or locality based on the detainer after he would otherwise be released on state charges. ICE Policy No. 10074.2 ¶¶ 2.4-2.6 (detainers may issue only to aliens arrested on criminal charges). Such a "speculative chain of possibilities does not establish" future injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). That is especially clear where, as here, "the prospect of future injury" rests "on the likelihood that [Gonzalez] will again be *arrested* for and charged with violations of the criminal law and will again be subjected to" to an unlawful seizure, *Lyons*, 461 U.S. at 103. In such circumstances, Gonzalez fails to show standing for prospective injunctive relief under *Lyons*. *Id.*; *see O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (courts must "assume that [individuals] will conduct their activities within the law"). And, again, because he lacks standing to seek injunctive relief, the district court erred in certifying the Probable Cause Class with Gonzalez as its representative and issuing class-wide injunctive relief. *See B.C. v. Plumas Unified School Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) ("[a] class of plaintiffs does not have standing to sue if the named plaintiff does not have standing").

***The District Court's Failure to Address Its Prior Order Independently Warrants Vacatur.*** The district court independently erred by failing to "reconsider" or "revise[]" its prior ruling that Gonzalez lacked standing. *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888-89 (9th Cir. 2001). "Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012). The law-of-the-case issues bars (among other things) a district court from deviating from its own rulings when the

court does not even "reconsider its own interlocutory order." *Santa Monica Baykeeper*, 254 F.3d at 888-89. Although "rulings of a trial court are subject to revision at any time before the entry of judgment," the district court must, at a minimum, actually "reconsider" or "revise[]" its ruling. *Id.*; *United States v. Estrada-Lucas*, 651 F.2d 1261, 1263-64 (9th Cir. 1980) ("A district court may change its own ruling if differences between the first and second trials of a case justify the change .... [W]e find no relevant change of circumstances which justified the judge's break with the law of the case.").

The district court here departed from those legal requirements. The court's decision and judgment does not address whether Gonzalez has standing to seek prospective injunctive relief; they do not even mention the prior order rejecting Gonzalez's standing to seek such relief. As noted, the court, more than five years ago, concluded that because plaintiffs had failed to allege facts showing a "reasonable likelihood of future injury" with respect to their various claims, they "again fail[ed] to establish ... standing to seek prospective injunctive relief." ER 193-94. That decision gave plaintiffs "one final opportunity" to demonstrate an entitlement to prospective injunctive relief either by amending the complaint to "plead additional facts demonstrating a substantial likelihood of future injury warranting prospective relief" or by "add[ing] an additional named plaintiff who can provide such factual allegations." ER 194. The district court was clear, however, that if plaintiffs "fail[ed] to" comply with the prerequisites for asserting a claim for injunctive relief, the "requests for prospective relief" as to all claims "will be denied *with prejudice*." *Id.* (emphasis

added). In response, plaintiffs explicitly disavowed their claim for prospective in-junctive relief: "Plaintiffs hereby notify the Court that they do not intend to amend their complaint to add additional plaintiffs or facts to support their second prayer for relief. Instead, they wish to move forward with the case without further amendment, and they recognize that the Court, based on its prior order, will dismiss the second prayer for relief *with prejudice*." ER 800 (Dkt. 63 at 1 (emphasis added)). By not even acknowledging or engaging with this previous holding, which dismissed plain-tiffs' claims for prospective injunctive relief, the district court clearly "abuse[d] its discretion" by nonetheless awarding plaintiffs prospective injunctive relief, *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997), and "no relevant change of circumstances ... justified the judge's break with the law of the case." *Estrada-Lucas*, 651 F.2d at 1264. That error alone supports vacatur of the class-wide injunction. *See id.*

## B. The Injunctions Should Be Vacated Because No Fourth Amendment Sei-zure Occurred.

Even if the plaintiffs had standing, the district court erred in concluding that any Fourth Amendment seizure occurred, Op. 26-30, and thus erred in issuing any relief, since all of that relief rested on the ground that Defendants had violated the Fourth Amendment.

The Fourth Amendment prohibits unreasonable "seizures." "[I]mplicit in the word 'seizure'" is the understanding that there is a government-caused "detention," that is, "an intentional acquisition of physical control," that is "willful." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989). Detainers are not mandatory commands;

they are "requests." *Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014). They do not "compel" a law enforcement agency "to do anything." *Garcia v. Taylor*, 40 F.3d 299, 304 (9th Cir. 1994). So the bare fact that ICE issues a detainer is not a seizure. Unless and until an alien is *detained* because of a detainer, no further intentional act by the government has "independently restrained" the alien. *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).

Under these principles, neither named plaintiff was ever seized, and so the district court had no basis for issuing class-wide injunctive relief (or even relief to plaintiffs). Although a detainer was issued for Gonzalez, Gonzalez was never detained because of ICE beyond the time required for his state criminal charges. ER 857, 860 ¶¶ 69, 85; ER 61. The district court believed that an unlawful seizure occurs if class members "have been or *will* be seized," Op. 26 (emphasis added), and that "ICE is liable for the arrests other law enforcement agencies make on immigration detainers." Op. 30. But even if that were true, it would show only that a seizure occurs if another law enforcement entity actually effects a *new arrest* based on the detainer. *See Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) (officer issuing detainer can be "responsible" for an additional detention "based solely on the detainer," if an actual new "unconstitutional" seizure occurs). A "seizure is a single act, and not a continuous fact," *California v. Hodari D.*, 499 U.S. 621, 625 (1991), and so a seizure occurs, if at all, only when the detainer is *acted* on to continue an alien's detention after they are otherwise entitled to release.

In district court, plaintiffs contended that individuals subject to detainers but not yet seized on them—such as Gonzalez—face a "threat of being subject to 48

additional hours ... of detention." ER 823 n.4. But to obtain *any* relief based on a Fourth Amendment claim, a plaintiff must point to an actual, new "detention." *Brower*, 489 U.S. at 596-97. The issuance of a detainer—a voluntary request that compels no action by state or local officers—does not result in any "physical control" unless a *new detention* based on the detainer occurs. That never happened for Gonzalez, and so Gonzalez had no Fourth Amendment claim at all.

Plaintiffs also have maintained that even if Gonzalez was never seized, Chinivizyan was, because as of July 10, 2013, he had been ordered released from criminal custody one week earlier and was being held "solely on the immigration [ICE] detainer." ER 843-44 ¶ 9. But even if true, it is irrelevant. Chinivizyan's detainer was based on review of his alien file, not a database search, Dkt. 221-11, Ex. K; Tr. Ex. 248 (Executive Summary Re: Chinivizyan, Simon), so he is not a member of the Probable Cause Subclass, because that class is limited to individuals subject to detainers "issued solely on the basis of electronic database checks." ER 14 & n.1 (noting only named plaintiffs for this class). Granting class-wide relief to a class whose representative is not a class member is an error that requires vacatur. *See Lierboe*, 350 F.3d at 1022 (explaining that in such circumstances "the district court's certification of the class with [plaintiff] as its representative must be vacated"); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("We have repeatedly held that a class representative must be part of the class."). And even if Chiniviziyan could be viewed as a representative of the Probable Cause Subclass, ICE did not cause any seizure he may have experienced. Although ICE issued a detainer for Chinivizyan to the Los Angeles Sheriff's Department (LASD) on June 19, 2013

27

(which it lifted on July 12, 2013), ER 858, 860 ¶¶ 75, 85, it neither asked for nor authorized the seizure that LASD effected when it refused to release Chinivizyan to the custody of "a residential drug treatment facility" as ordered by a state judge. ER 858 ¶ 76. The detainer itself instructed that it should not affect decisions on Chinivizyan's "custody classification, work, quarter assignment, or other matters." Dkt. 221-11, Ex. K. That LASD held him anyway, citing its *own* policy, does not mean that ICE intentionally caused or "induced" a "detention." *Brower*, 489 U.S. at 596-97. So like Gonzalez, Chinivizyan had no Fourth Amendment claim against ICE. And even if he did, the district court would still have erred in issuing injunctive relief on behalf of aliens differently situated, like Gonzalez. *Lewis v. Casey*, 518 U.S. 343, 359-60 & n.7 (1996).

## II.   The State-Authority Injunction Rests on Serious Errors of Law.

Even apart from the threshold grounds for vacatur set forth above, the state-authority injunction should be vacated because it is wrong on the merits. The district court erred in concluding that "ICE violates the Fourth Amendment by issuing detainers to state and local law enforcement agencies in states that do not expressly authorize civil immigration arrests in state statute." Op. 29-30. A motions panel of this Court already stayed that portion of the injunction. Stay Op. 1. This Court should now vacate it.

ICE does not violate the Fourth Amendment by issuing detainers in States that do not expressly authorize civil immigration arrests. To start, the Fourth Amendment plainly permits *federal officers* to make civil arrests of aliens based only on probable cause of removability contained in a detainer or administrative warrant. *See, e.g.,*

*Abel v. United States*, 362 U.S. 217, 233 (1960) (noting "impressive historical evidence" of validity of "administrative deportation arrest from almost the beginning of the Nation"); *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018) ("It is undisputed that federal immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability."). And the Fourth Amendment does not apply differently when a local official rather than a federal official is arresting or detaining. "The Fourth Amendment's meaning [does] not change with local law enforcement practices." *Moore*, 553 U.S. at 168. To hold otherwise would cause Fourth Amendment "protections [to] vary if federal officers were not subject to the same statutory constraints as state officers." *Id.* at 176. In addition, state and local officers may rely on the probable-cause determinations of ICE officers when making new arrests based on immigration detainers. *See, e.g.*, *El Cenizo*, 890 F.3d at 187-88 ("ICE detainer [] constitutes a paradigmatic instance of the collective-knowledge doctrine); *Mendoza v. United States Immigration & Customs Enforcement*, 849 F.3d 408, 414-15, 418 (8th Cir. 2017) ("The County employees were entitled to rely on [ICE's] probable cause determination" in the "ICE detainer"); *United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007) (knowledge of one officer may be presumed imputed to another). The district court thus should have held—consistent with Ninth Circuit authority—that a state or local officer's seizure for an immigration offense complies with the Fourth Amendment whenever a federal officer's seizure would comply with the Fourth Amendment, such as when the arrest is made at federal direction in aid of removal or removal

proceedings. *See* 8 U.S.C. §§ 1226, 1231(a); *Martinez-Medina*, 673 F.3d at 1037. Any conflict with state law does not implicate the federal Constitution.

In concluding otherwise and ruling that State law controls whether a Fourth Amendment seizure occurs, Op. 29-30, the district court relied on *Ker v. California*, 374 U.S. 23, 37 (1963), for the proposition that "under the Fourth Amendment ... the lawfulness of arrests for federal offenses is to be determined by reference to state law." Op. 29. But *Moore* squarely holds that reasonableness under the Fourth Amendment does not depend on "statutory constraints [on] state officers" that vary State by State. 553 U.S. at 172. And *Ker*, which upheld a state arrest without a warrant against a Fourth Amendment challenge, recognized that even when arrests are consistent with state law the Court had "to determine whether, notwithstanding its legality under state law, the method of entering the home may offend federal constitutional standards of reasonableness." 374 U.S. at 38. The district court also observed that "state and local law enforcement generally lack authority to arrest individuals suspected of civil immigration violations." Op. 28. But that is true only where state officers act "unilateral[ly]" in the absence of a "request" or "express direction" from the federal government, *see Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 465-66 (4th Cir. 2013), and an ICE detainer is a "federal request." *El Cenizo*, 890 F.3d at 187.

The district court relied on *Arizona*, 567 U.S. at 408, for the proposition that the "[INA] expressly entrusts the enforcement of civil immigration law to federal agents and officers," Op. 28, suggesting that this means "ICE violates the Fourth Amendment" in asking state officers for assistance in immigration enforcement, *id.*

at 28-29. But *Arizona* held no such thing. *Arizona* merely observed that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." 567 U.S. at 413. *Arizona* does hold that state and local officers cannot *unilaterally* make civil-immigration arrests. *Id.* at 410. But that has nothing to do with the Fourth Amendment. It is instead a matter of preemption: given the primacy of the federal government in immigration, state and local officers cannot enforce immigration laws "unilateral[ly]." *Id.* But they *can* aid federal immigration enforcement in response to a federal "request, approval, or other instruction from the Federal Government." *Id.*; *see Santos*, 725 F.3d at 465 (noting absence of a federal "request" or "express direction" before local officers "arrest[ed] ... individual solely based on known or suspected civil violations of federal immigration law"). An ICE detainer is a "federal request," so state or local officers can effect arrests premised on detainers consistent with federal law. *El Cenizo*, 890 F.3d at 189; *see United States v. Ovando–Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014) (deeming "meritless" the claim that a state officer could not detain an alien on behalf of federal officers at their request). Indeed, this Court, in a decision the district court did not cite, has held that even where a state officer "lacked the authority under [state] law to apprehend [someone] based solely on a violation of federal immigration law," under *Moore*, that "violation of [state] law does not constitute a Fourth Amendment violation." *Martinez-Medina*, 673 F.3d at 1036. And if a violation of state law that *affirmatively* prohibits an arrest based on a detainer is not a Fourth Amendment violation, then issuing a detainer to a State that lacks *any* statute on the issue—let alone a statute barring detainer-based arrests—cannot violate the Fourth Amendment. *See* ER 227

n.8 (citing cases, from six jurisdictions, that the state-authority injunction conflicts with).

As the panel properly recognized in granting a stay, the state-authority injunction is flawed and should be vacated.

## III. The Database Injunction Should be Vacated.

The database injunction should be vacated on two independent grounds.

***Class-Wide Relief Was Improper.*** The district court also erred in certifying the Probable Cause Subclass, a class consisting of *persons*, alien and citizen alike, with Gonzalez, a *citizen* whose detainer was issued under unique circumstances not representative of the class, as its named representative, ER 154-55, 162, and accordingly erred in issuing class-wide injunctive relief. *See Meredith v. Oregon*, 321 F.3d 807, 814 (9th Cir. 2003) ("[B]ecause certification of a class provides the basis for granting relief on a classwide basis, an injunction granting class-wide relief cannot be affirmed without also upholding the class certification order."). The district court erred in three key respects.

*First*, the district court erred in concluding that the Probable Cause Subclass satisfied the "commonality" requirement of Rule 23. A class action must be capable of "generat[ing] common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The district court thought the question presented capable of generating a common answer to be ICE's "alleged practice of basing probable cause only on information contained in an online database, rather than through in-person interviews or determinations," such that "individual determinations of whether ICE had probable cause as to any given individual

is unnecessary." ER 169. In other words, the district court's order proceeds as though reliance on a database presumed to be unreliable renders any arrest, regardless of individual circumstances, relying on that database categorically unlawful. But the district court made no square ruling to that effect—which itself makes its certification order an abuse of discretion. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (district court "must conduct a 'rigorous analysis'" of whether Rule 23 criteria are satisfied.).

Nor could the district court have made such a ruling. "[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context." *United States v. Drayton*, 536 U.S. 194, 201 (2002). Probable cause "deals with probabilities and depends on the totality of the circumstances" in an individual case, requiring a court to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). The question whether probable cause exists for an arrest—and so by extension to issue a detainer—is "pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." *See Sibron v. New York*, 392 U.S. 40, 59 (1968). That follows from the fact that whether a specific arrest is lawful is informed by the specific "experience and specialized training" of each officer, and the specific "inferences from and deductions about the cumulative information available to them" when they make the probable cause determination. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

That is especially so in the context of ICE's database practices, where different ICE officers rely on an evolving set of available information across dozens of databases, in combination with information relating to specific aliens, such as biometrics, and then, based on the individual judgment of many different immigration officers, issue a detainer. *See, e.g.*, *Drayton*, 536 U.S. at 203. The fact that a database source may itself be unreliable, or even categorically so, therefore does not mean that a probable-cause finding based on that database will be unlawful in every instance. *See id.* Indeed, in other contexts in which law enforcement relies on information not directly known to the arresting officer, the Supreme Court has rejected "strict evidentiary checklist[s], whose every item the State must tick off" to prove reliability. *Florida v. Harris*, 568 U.S. 237, 244 (2013) (applying reasonableness analysis to arrests based in part on a drug-detection dog). Under such categorical rules, "[n]o matter how much other proof the state offers of [] reliability, the absent [] records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis.'" *Id.* at 245. "A gap as to any one matter" in the analysis "should not sink the [government's] case." *Id.*

The district court failed to account for these points, concluding instead that whether an ICE officer violates the Fourth Amendment in relying on a database search can be found unlawful in all circumstances, and is thus amenable to class treatment. ER 154-55, 184. The court thus held that "individual determinations of whether ICE had probable cause as to any given individual is unnecessary." ER 169. That was error. Given that each individual arrest must be assessed on its individual circumstances at the time the arrest is made, even if the database alone is unreliable,

the database search is but one part of the "totality-of-the-circumstances analysis." *Harris*, 568 U.S. at 244. Regardless of whether the databases ICE searches may or may not independently or collectively be categorically unreliable, each individual detainer must be assessed "from the standpoint of an objectively reasonable police officer," based on the "historical facts" and other cumulative information available to the issuing officer, including the database searched and any other information known by the issuing officer. *Pringle*, 540 U.S. at 371.

The district court thus erred in certifying a class premised on the assumption that a categorically unreliable database would always result in an unlawful seizure. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609–10 (1997) (affirming that when "factual differences" "translate[] into "significant legal differences," class certification is inappropriate). And that error renders the district court's certification of the Probable Cause Subclass an abuse of discretion, because "[t]he premise of ... class certification is that one rule applies to all members," "reasonableness is a standard rather than a rule," and "one [arrestee's] circumstances differ from another's, [so] common questions" are lacking "and class certification is inappropriate." *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010). This is thus not a case where "either [the policy and practice] is unlawful as to every [class member] or it is not." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014).

*Second*, the district court erred in concluding that Gonzalez's claims were "typical," and that Gonzalez would adequately represent the class, where Gonzalez did "not currently have immigration detainers issued against [him]" and was a "United States citizen[]," ER 170, while many class members are aliens. The core

test for both typicality and adequacy is whether "the claim or defense of the class representative" is not unique to the named plaintiff, and "whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (named plaintiff is "neither a typical nor adequate class representative [if he is] subject to unique defenses").

Gonzalez fails this test for multiple reasons. To begin, unlike the bulk of the class he purports to represent, Gonzalez is a United States citizen. What constitutes probable cause to issue a detainer for someone who is or who the government should have known is a citizen will differ from what constitutes probable cause to issue a detainer to someone the government has no reason to know is a citizen, or who is clearly not a citizen, because probable cause must be assessed based on the totality of the circumstances known to the officer using the detainer in any given individual case. *See supra* 33-35. And even with citizen class-members, "[e]vidence of foreign birth [] gives rise to a rebuttable presumption of alienage," *Scales v. INS*, 232 F.3d 1159, 1163 (9th Cir. 2000), and absent specific information that an alien may have a citizen parent through which they derived citizenship, an officer may rely on that presumption. *See id.* But the district court made no finding that this presumption was rebutted as to *every* Probable Cause Class member, so by definition Gonzalez's claim—premised on his citizenship—could not be typical of the class.

The district court concluded that typicality was satisfied because Gonzalez's possible "detainment based on the flawed information in the database makes him typical of the class." ER 171. But the court did not ultimately find that the databases

ICE relies on are categorically "flawed" as to all individuals issued a detainer, such that all arrests premised on detainers are unlawful at the time of arrest. Indeed, it focused on what it viewed were the databases' deficiencies in providing sufficient information allowing a law enforcement officer to ensure *citizens* were not issued detainers. Op. 33-34. But that narrow focus defeats the court's broad certification of a class of citizens and aliens alike. Absent a presumption of alienage, a case-by-case analysis is required to assess whether in an individual's case "there was still probable cause to believe he was an alien" or "not qualified for derivative citizenship." *Belleri v. United States*, No. 10-81527-CIV, 2012 WL 12892399, at *7 (S.D. Fla. Jan. 17, 2012), *vacated on other grounds*, 712 F.3d 543 (11th Cir. 2013).

And even if government records correctly identify an individual's parents as "United States citizen[s]," that would "not have conclusively meant that [the individual] was a derivative citizen," and therefore not properly subject to a charge of removability, absent other evidence "requir[ing] additional investigation." *Douglas v. United States*, 796 F. Supp. 2d 1354, 1365 (M.D. Fla. 2011). To be sure, "[a] police officer may not ignore *conclusively* established evidence" that would negate a probable-cause finding before issuing an arrest request. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) (emphasis added); *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (similar); *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002) (similar).[3] So if an officer issuing a detainer had specific, conclusive evidence that a specific individual was not "an alien," *see* 8 U.S.C.

---

[3] Although this Court has not explicitly addressed the issue, it has held in the qualified-immunity context that officers could not "reasonably believe there was probable

§ 1229a(c)(3)(A), that may "negate probable cause" of alienage. *Sanchez v. Labate*, 564 F. App'x 371, 373 (10th Cir. 2014). But absent such evidence known to the officer issuing a detainer, that officer has no duty to investigate the validity of any defense to a civil charge of removabilty. *See Baker v. McCollan,* 443 U.S. 137, 145-46 (1979). So the district court erred in concluding that the possibility of "flawed information," ER 171, as to Gonzalez made his claims typical of the class, without finding that, categorically, all class members could establish an affirmative defense to removability by virtue of being citizens.

The district court also concluded Gonzalez's claims were typical even though he did "not currently have immigration detainers issued against [him]," because "Gonzalez [was] subject to immigration detainers at the time [he] joined the litigation," so it is "unreasonable to expect the named plaintiffs' to be subject to an immigration detainer throughout the entirety of this litigation," and thus "the transitory exception applies to the Gonzalez Plaintiffs' claims and their claims are not moot." ER 170-71. But that confuses the distinct issues of whether a plaintiff's claims are *typical* of the class, and whether mootness of the named plaintiffs' claims moots out the class in its entirety. To be sure, this Court has held that certain claims raised by a putative class representative may be so "inherently transitory," meaning that "the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," such that it is appropriate to deem the mooted claims to "relate[] back" to the filing of the operative

---

cause to arrest" where they falsely told other officers that suspect had not acted in self-defense. *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir.1997).

complaint. *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090-91 (9th Cir. 2011). But even assuming that the relation-back doctrine applied here—an issue the Court need not address—it does not answer the question of whether Gonzalez's Fourth Amendment claim as pleaded in the operative complaint is "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Gonzalez's claim is that he, a U.S. citizen, was illegally seized because of a detainer that was based on a database search. ER 844 ¶¶ 11-12. But as explained, at the time of the operative complaint he was not seized because of a detainer. *See supra* 21-22. By definition, then, his Fourth Amendment claim is atypical of class members who were in fact seized because of a detainer. Moreover, unlike many members of the Probable Cause Subclass, Gonzalez is a citizen, and so his Fourth Amendment claim turns on facts and circumstances specific to his nationality and place of birth that are not typical of the class as a whole. *See Hanon*, 976 F.2d at 508. Indeed, Gonzalez's own allegations show the uniqueness of his circumstances: the LAPD "incorrectly wrote on [his] booking record that he was born in Mexico." ER 856, ¶ 61; *see* ER 55. ICE then relied on that information to issue Gonzalez's detainer. ER 390, 393, 506. That mistake likely "did not negate probable cause," because it is "not unreasonable for [officers] to rely on the factual misinformation gleaned from official police sources." *Weinstein v. City of Eugene*, 337 F. App'x 700, 701 (9th Cir. 2009); *see Rohde v. City of Roseburg*, 137 F.3d 1142, 1143-44 (9th Cir. 1998) (explaining that officer's good-faith reliance on facts derived from a police report—even if those facts are later determined to be erroneous—can be sufficient to establish probable cause). More importantly, the fact that ICE relied on

what turned out to be a mistake by another law enforcement agency in issuing Gonzalez a detainer makes his claims atypical of the class he represents, because his Fourth Amendment claim turns on the reasonableness of that reliance. *See Hanon*, 976 F.2d at 508.

The fact that Gonzalez is a citizen renders his claim atypical for an additional, threshold reason the district court failed to consider: it lacked subject-matter jurisdiction over the claims of *aliens* asserting a Fourth Amendment challenge to their detainers. Title 8 U.S.C. § 1252(b)(9) provides that "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States ... shall be available only in judicial review of a final order under this section," and that "no court shall have jurisdiction ... to review such an order or such questions of law or fact" other than through review of a final order of removal. Section 1252(b)(9)—"the unmistakable 'zipper' clause"—channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *Reno v. Am.-Arab Anti-Discrimination Com.*, 525 U.S. 471, 483, 485 (1999). This provision strictly limits federal district court jurisdiction over "any issue—whether legal or factual—arising from any *removal-related activity* [which] can be reviewed only through the [administrative] process." *J.E.F.M. v. Lynch*, 837 F.3d at 1026, 1029-30 (9th Cir. 2016) (emphasis added). And as a plurality of the Supreme Court recently explained, section 1252(b)(9) at the very least strips district courts of jurisdiction to hear claims concerning not just situations

seeking "review of an order of removal," but also "challeng[es to] the decision to detain [aliens] in the first place or to seek removal." *Jennings*, 138 S. Ct. at 841.[4]

The issuance of a detainer falls within section 1252(b)(9)'s prohibition on district court review. The decision to issue a detainer—and the process by which ICE does so—is an action taken to "detain [an alien] in the first place" or to "seek [their] removal." *Id*. As explained, a detainer is the mechanism by which the federal government communicates to other law enforcement agencies that it "seeks [to take] custody of an alien presently in the custody of that agency, for the purpose of *arresting and removing the alien*." 8 C.F.R. § 287.7(a) (emphasis added). The issuance of a detainer is thus the penultimate law enforcement action ICE takes before arresting and detaining the alien for removal proceedings, and so challenges to the issuance of a detainer arise from an "action taken ... to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Gonzalez's claims thus cannot be typical of the claims of all non-citizen class members, because Gonzalez's claims and defenses are not similar to those of alien class members.

The district court, in addressing section 1252(b)(9) independent of any class certification analysis, concluded that section 1252(b)(9) did not apply to Gonzalez's Fourth Amendment claim because he was "not subject to ongoing removal proceedings at the time that ICE issued detainers against [him]." ER 123-24. But even were that true as to *Gonzalez*—an individual ultimately found to be a citizen who cannot

---

[4] Justice Thomas, writing for himself and Justice Gorsuch, agreed, concluding that section 1252(b)(9) is not limited "to challenges to the removal order itself," and reaches, at the least, the scenarios contemplated by Justice Alito's plurality opinion. 138 S. Ct. at 855.

be placed in removal proceedings and so cannot appeal such proceedings to the courts of appeal, *see* 8 U.S.C. § 1252(b)(9) (referring to "an alien")—it would not be true as to class members who *are* aliens. The district court also reasoned that Gonzalez's claims "relate to the ICE officers' actions before removal proceedings were filed," such that his claims "are independent of the removal process" and not barred by section 1252(b)(9). ER 123-24. But, at least as to aliens, that too is wrong, because section 1252(b)(9) covers *both* "actions taken" before removal proceedings are initiated, and the actual "proceedings brought" to remove an alien. 8 U.S.C. § 1252(b)(9). The district court's contrary ruling "render[s] the word 'action'" in section 1252(b)(9) "superfluous and effectively excise[s]" it from the statute. *Aguilar v. ICE*, 510 F.3d 1, 10 (1st Cir. 2007). That some detainers might be issued "prior to the institution of any formal removal proceedings" is irrelevant, as the statute channels challenges to "actions taken" before formal removal proceedings begin as well. *See id*.

The district court also reasoned that even if aliens could raise such claims in their removal proceedings, "many of the class members, while subject to detainers, were or are never placed in removal proceedings," such that if section 1252(b)(9) barred their claim, "it would be tantamount to denial of judicial review." ER 124. But even were that were correct, it would mean only that certain unidentified class members could not raise their claims in removal proceedings as required by section 1252(b)(9). *Cf. Pinho v. Gonzales*, 432 F.3d 193, 202 (3d Cir. 2005) (agency "decision is final where there are no deportation proceedings pending in which the decision might be reopened or challenged"). As to the many class members who did or

will have removal proceedings, they can raise any Fourth Amendment challenge in those proceedings. *See, e.g.*, *Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018); *Rajah v. Mukasey*, 544 F.3d 427, 441, 446-47 (2d Cir. 2008). Indeed, claims related to detainers and alleged Fourth Amendment violations are routinely raised in petitions for review before the courts of appeals. *See, e.g.*, *Armas-Barranzuela v. Holder*, 566 F. App'x 603 (9th Cir. 2014); *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994); *Cotzojay v. Holder*, 725 F.3d 172 (2d Cir. 2013). As to Probable Cause Subclass members whose claims are subject to section 1252(b)(9), Gonzalez's claims are not typical.

*Finally*, the court erred in concluding that plaintiffs satisfied Rule 23(b)(2). ER 183. "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018). But here a single injunction or declaration can do no such thing because, as discussed, even if a database itself is unreliable, that does not mean a seizure premised on a database search can be categorically unlawful, because probable cause will depend on "the concrete factual context of the individual case," *Sibron*, 392 U.S. at 59, and unreliability on one factor in the totality-of-the-circumstances can be made up by "other indicia of reliability," *Florida*, 568 U.S. at 245, or the "experience and specialized training" of the specific officer and the specific "inferences from and deductions about the cumulative information available to them." *Arvizu*, 534 U.S. at 273; *see United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) (totality-of-circumstances turns in part on "experience and expertise

of the officers involved in the investigation and arrest" and how they resolve "conflicting information" in specific circumstances). That being so, no single order can resolve the Probable Cause Subclass's claims, because "each individual class member would be entitled to a different injunction or declaratory judgment against the defendant" depending on whether their individual circumstances in addition to ICE's reliance on a database search did not satisfy probable cause. *Dukes*, 564 U.S. at 360.

For these reasons, the Court erred in certifying the Probable Cause Subclass with Gonzalez as its representative.

***The Database Injunction Rests on Several Errors.*** Even if the district court properly certified the Probable Cause Subclass, it erred in concluding that "the databases used by ICE" *categorically* "do not sufficiently establish probable cause of removal." Op. 33; *see* Judgment 1, 3-5.

To begin, the district court disregarded much of the record. It erroneously based its decision regarding ICE's current databases practices on a government report from *1995* and ICE's database practices *as of 2015-2016*, when it reviewed only *four* databases, where ICE introduced evidence showing that those databases are constantly upgraded and that ICE's database practices changed dramatically in 2017 and again in 2018. As of November 29, 2018, ICE officers at the PERC queried more than 30 databases (compared to *4* databases in 2015-2016), ER 511, compared to 2015-2016. The court thus enjoined ICE database practices in *2019*—which rely on over *30 databases*—based on findings concerning only *four* databases. Op. 16-25. In fact, the district court noted at least *eight* such new databases, but made no findings on their reliability. Op. 15 n.12. Finding database practices as they exist in 2019

categorically unreliable based on evidence about dramatically different and more limited database practices from 1995 or 2015 is clear error.

Even under the evidence on which the district court focused, it clearly erred in finding a categorical Fourth Amendment violation. That evidence showed that from May 2015 to February 2016, of the 12,797 detainers issued by the PERC, 42, or less than 0.5%, involved individuals ultimately found to be U.S. citizens. ER 255-63 (Tr. 812:12-817:25), 377; *see* ER 265-372. The evidence thus fails to show "routine or widespread errors," *Herring*, 555 U.S. at 147, or that a "large percentage" of detainers issued are inherently unreliable, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 670 (7th Cir. 2016). At most, it is evidence that ICE *in 2015* was "using something less than an all-encompassing database," *United States v. Esquivel-Rios*, 786 F.3d 1299, 1309 (10th Cir. 2015), a far cry from the "garbage in, garbage out," *id.* at 1304, necessary to conclude that a database system "is systemically negligent," *id.*, such that ICE officers categorically do not act "reasonably in their reliance on the recordkeeping system itself." *United States v. Santa*, 180 F.3d 20, 27 (2d Cir. 1999). And even if less than 0.5% were sufficient to make that showing as of 2015, the evidence in 2018 showed that—given new database practices implemented in 2017 and 2018, mandating review of more than 30 databases (*see* ER 511)—error rates concerning citizens would be "significantly lower today." ER 244 (Tr. 1466:22-23).

The district court declared that ICE's database practices at the time of trial were categorically unlawful, primarily because they did not require officers to "interview" an "individual" "regarding [their] citizenship," which the court asserted

was "[t]he most reliable source of information about a person's citizenship." Judgment 1; *see* Op. 32-33. But "[p]robable cause is not a high bar," *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018), and need be based only on "reasonably trustworthy information sufficient to warrant a prudent person in believing" that a person has committed a violation. *Rohde*, 137 F.3d at 1144. "Rigid legal rules are ill-suited" to the "divers[e]" area of probable cause. *Gates*, 462 U.S. at 232. There is no requirement "to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Indeed, in the removal context, "[e]vidence of foreign birth [] gives rise to a rebuttable presumption of alienage." *Scales v. INS*, 232 F.3d 1159, 1163 (9th Cir. 2000). The district court's suggestion that a database system is likely categorically unreliable if it does not require in-person interviews thus erects an impermissibly heightened standard unsupported by the caselaw and was clearly erroneous.

## IV. Further Limits on Equitable Relief Warrant Vacating or Substantially Narrowing the Injunctions

At a minimum, the Court should narrow the injunctions.

First, the injunctions undermine the Executive Branch's authority to secure the Nation's borders and frustrates the "public interest in effective measures to prevent the entry of illegal aliens. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

The injunctions bar the government from using a critical law enforcement tool needed to apprehend tens of thousands of criminal aliens a year in 47 States, resulting in thousands of criminal aliens evading arrest and removal. As set forth at trial, during the first quarter of 2019, the PERC issued nearly 11,500 detainers, which, on

an annualized basis, would amount to nearly 46,000 detainers for FY2019. *See* ER 250 (Tr. 1140:16-20). All such detainers are issued to aliens arrested for or convicted of crimes, *see* ICE Policy No. 10074.2 ¶¶ 2.4-2.6, including many thousands of serious, violent offenders. *See* ICE Operations Report 16. ICE will also need to conduct arrests of such persons at-large, where there is a greater risk to ICE officers' and others' lives and a larger disruption of local communities. *Id*. Those arrests require a greater number of arresting officers, as opposed to the one or two officers who can arrest an alien safely in criminal custody *Id*. ICE, already short-staffed, cannot make-up the shortfall, and so many thousands of dangerous aliens will evade apprehension and removal from the country. *Id*. at 16-17. The injunctions also erect an impossible standard, requiring ICE agents to interview aliens in jurisdictions that forbid such interviews, and is deeply misguided, as it requires ICE officers to take aliens at their word concerning their alienage, notwithstanding evidence that aliens routinely give false information about identity to avoid arrest or removal. *See* ER 967-71. The injunctions thus inflict major, irreparable damage on the United States and the public.

Against this, plaintiffs and class members are not substantially or irreparably harmed. The named plaintiff has never even been detained because of a detainer, and any possible future detention based on a detainer—which can issue only to aliens arrested for new crimes—is entirely speculative. And as to any class members who were detained—a point on which plaintiffs presented no evidence at trial—any future detention based on a detainer is speculative. *Lyons*, 461 U.S. at 107-08. Such

speculation cannot outweigh the harm imposed on the sound and "efficient administration of the immigration laws." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). And the challenged practices have been undertaken for years (including the seven years this litigation was pending).

Second, the injunctions exceed the court's authority under 8 U.S.C. § 1252(f)(1), which provides: "no court ... shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part IV" of the INA, "other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated." The provision is an unequivocal bar on "classwide injunctive relief against the operation of §§ 1221-123[2]." *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018); *Reno*, 525 U.S. at 281 ("[Section 1252(f)] prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231."). And as this Court recently explained, that provision bars injunctive relief on behalf of aliens "not yet facing proceedings under 8 U.S.C. §§ 1221–1232." *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020).[5]

The injunctions violate section 1252(f) because they place "limitations on what the government can and cannot do under the removal and detention provisions" found nowhere in the relevant statute, *see Hamama v. Adducci*, 912 F.3d 869, 880 (6th Cir. 2018), and does so on behalf of a class consisting of many individuals "not yet facing proceedings" under sections 1221-1232. *Padilla*, 953 F.3d at 1151. The

---

[5] This Court also held that section 1252(f)(1) does not foreclose class-wide injunctive relief on behalf of individual aliens, "each of whom is in removal proceedings." Op. 33. That is wrong, *see* Gov't Br. 22-29, *Padilla v. ICE*, 19-35565 (9th Cir.), but the Court need not resolve that issue here.

INA specifically authorizes the government to, through detainers, request coopera-

tion "either to hold the prisoner for the agency or to notify the agency when release

[] is imminent." *McLean v. Crabtree*, 173 F.3d 1176, 1185 n.12 (9th Cir. 1998).

Although that detainer "authority" "predates the INA and has long been viewed as

implied by federal immigration enforcers' authority to arrest those suspected of be-

ing removable," *Santoyo*, 2017 WL 6033861, *3, it is now codified in, among other

statutes, 8 U.S.C. §§ 1226 and 1231, both covered by section 1252(f). *See* 8 C.F.R.

§ 287.7 (citing sections 1103, 1226, 1231, and 1357); *accord Comm. for Immigrant*

*Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1199 (N.D. Cal.

2009) (noting this statutory authority). The classwide injunctions restrain ICE's im-

plementation of its detention authority under sections 1226 and 1231, to arrest and

detain removable aliens by erecting requirements ICE must follow before issuing

detainers. But using an injunction to re-write the statute to include limitations on the

government's authority "that [do] not exist in the statute" is what section 1252(f)

forecloses. *Hamama*, 912 F.3d at 879-80. Accordingly, the Court lacked authority

to issue an injunction covering any individual alien not subject to removal proceed-

ings. *Padilla*, 953 F.3d at 1151.

Third, even without section 1252(f), the injunctions conflict with Article III,

which requires that a "remedy must be tailored to redress the plaintiff's particular

injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Granting relief "apart from

any concrete application that threatens imminent harm to [plaintiffs'] interests"

would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth*

*Island Inst.*, 555 U.S. 488, 494 (2009). The injunctions improperly do just that by

granting relief to aliens not injured by the ICE practices challenged in the operative complaint, either because they have never in fact been seized because of a detainer or are not likely to be seized based on a detainer in the future, or because their detainer was supported by a reasonable finding of probable cause. The injunctions also extend beyond the Probable Cause Subclass's alleged "database" injuries in instances where aliens have been actually *seized* because of a database search to reach the issue of ICE's authority to issue detainers in States lacking affirmative statutory authority to make civil immigration arrests, and the issuance of detainers when accompanied by administrative warrants under a new 2017 policy—issues raised nowhere in the complaint. And the injunction extends to ICE's *current* database practices, but is based on evidence concerning database practices from 1995 and 2015-16, and allegations in the complaint from 2014. ER 377; ER 243-45 (Tr. 1465:21-1467:1). An injunction enjoining ICE conduct reaching far beyond the actually demonstrated *injuries* and claims in this case is an abuse of discretion *See Lewis*, 518 U.S. at 359-60 & n.7. Thus, at a minimum, this Court should narrow the injunction to reach only class members who were actually *unlawfully seized* as a result of the database practices challenged in the complaint, and vacate the injunction in all other respects.

//

//

# CONCLUSION

This Court should vacate the judgment, de-certify the Probable Cause Sub-class, and remand with instructions to dismiss this case.

DATED: May 20, 2020   Respectfully submitted,

        JOSEPH H. HUNT
        Assistant Attorney General
        Civil Division

        SCOTT G. STEWART
        Deputy Assistant Attorney General

        WILLIAM C. PEACHEY
        Director, Office of Immigration Litigation –
        District Court Section

        */s/ Erez Reuveni*
        EREZ REUVENI
        Assistant Director
        United States Department of Justice
        Civil Division
        P.O. Box 868, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-4293 | Fax: (202) 305-7000
        Erez.r.reuveni@usdoj.gov

        LAUREN C. BINGHAM
        Senior Litigation Counsel

        FRANCESCA GENOVA
        ARCHITH RAMKUMAR
        Trial Attorneys

        *Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2020, I served a copy of this document on the Court and all parties by filing it with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and a link to this document to all counsel of record.

DATED: May 20, 2020                    Respectfully submitted,

*/s/Erez Reuveni*
EREZ REUVENI
Assistant Director
U.S. Department of Justice

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27 because it contains 13,926 words, including footnotes. This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally-spaced typeface using Microsoft Word 14-point Times New Roman font.

DATED: May 20, 2020          Respectfully submitted,

*/s/Erez Reuveni*
EREZ REUVENI
Assistant Director
U.S. Department of Justice

*Counsel for Defendants-Appellants*