Nos. 20-55175, 20-55252
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

**Gerardo Gonzalez**, *et al.*,
Plaintiffs-Cross-Appellant/Appellee

v.

**Immigration and Customs Enforcement**, *et al.*,
Defendants-Cross-Appellant/Appellee
_____

On Appeal from the United States District Court, Central District of California
No. 2:13-cv-04416-AB-FFM
_____

**CROSS-APPELLANT/APPELLEES' PRINCIPAL AND RESPONSE BRIEF**

_____

JENNIFER PASQUARELLA
jpasquarella@aclusocal.org
JESSICA KARP BANSAL
jbansal@aclusocal.org
ZOE MCKINNEY
zmckinney@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-5211
Facsimile: (213) 977-5297

BARRETT S. LITT
blitt@kmbllaw.com
LINDSAY B. BATTLES
lbattles@kmbllaw.com
KAYE, MCLANE, BEDNARSKI, &
LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

*(Continued on next page)*

SPENCER E. AMDUR
samdur@aclu.org
CODY WOFSY
cwofsy@aclu.org
ACLU FOUNDATION,
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Facsimile: (212) 395-0950

OMAR C. JADWAT
ojadwat@aclu.org
ACLU FOUNDATION,
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654

MARK M. FLEMING
mfleming@heartlandalliance.org
RUBEN LOYO
rloyo@heartlandalliance.org
NATIONAL IMMIGRANT
JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION.....................................................................3

STATEMENT OF THE ISSUES PRESENTED ..................................................4

PERTINENT STATUTES AND REGULATIONS ..............................................5

STATEMENT OF THE CASE..............................................................................5

I.   Factual Background...................................................................................5

    A.   ICE's Use of Detainers..................................................................5

    B.   Changes to ICE's Detainer Regime. ............................................7

    C.   Automation and the Absence of Any Neutral Review of Detainer Arrests Have Enabled Troubling Practices...........................................................9

    D.   ICE's Current Use of Databases to Assess Probable Cause. ...................11

    E.   State Laws on Civil Immigration Arrests. ................................12

II.  Procedural History...................................................................................13

STANDARD OF REVIEW ................................................................................15

SUMMARY OF THE ARGUMENT ..................................................................16

ARGUMENT ......................................................................................................19

I.   ICE DETAINERS VIOLATE THE FOURTH AMENDMENT RIGHTS OF THE PROBABLE CAUSE SUBCLASS. ....................................................19

    A.   The District Court Correctly Held ICE Violates the Fourth Amendment by Issuing Detainers Based on Outdated, Incomplete, Error-filled Databases..................................................................................19

    B.   This Court Need Not Reach the State Authority Claim But, if it Does, It Should Affirm. ..........................................................................27

II.  THE DISTRICT COURT CORRECTLY ENJOINED THE ISSUANCE OF DATABASE DETAINERS................................................................................31

    A.   Plaintiff Gonzalez Has Standing. .........................................................31

    B.   The District Court's Prior Standing Decision Does Not Bar the Relief it Ordered..................................................................................34

    C.   Plaintiff Gonzalez Properly Sued to Enjoin an Actual and Imminent Seizure. ..................................................................................36

D.    Class Certification Was Proper. ................................................38

E.    The Injunction is Proper. ........................................................45

III. *CROSS-APPEAL*: ICE DETAINERS VIOLATE THE REQUIREMENT
THAT A NEUTRAL OFFICIAL PROMPTLY DETERMINE PROBABLE
CAUSE. ..................................................................................50

A.    Detainer Arrests Violate the Requirements of *Gerstein*. ........................50

B.    The *Gerstein* Rules Apply to All Arrests, Including Detainer Arrests. ....56

CONCLUSION ......................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007)......................................................................42

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) (en banc) ...........................................15

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973)......................................................................59, 60

*Arias v. Rogers*,
676 F.2d 1139 (7th Cir. 1982) ............................................................52

*Arizona v. Evans*,
514 U.S. 1 (1995) (O'Connor, J., concurring)....................................20

*Armas-Barranzuela v. Holder*,
566 Fed. App'x 603 (9th Cir. 2014) ...................................................44

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001), *overruled on other grounds*, *Johnson
v. California*, 543 U.S. 499 (2005) .....................................................36

*Atwater v. City of Lago Vista*,
532 U.S. 318 (2001).............................................................................61

*Barahona-Gomez v. Reno*,
236 F.3d 1115 (9th Cir. 2001) ............................................................48

*Bostic v. Rodriguez*,
667 F. Supp. 2d 591 (E.D.N.C. 2009) ................................................28

*Brower v. Cty. of Inyo*,
489 U.S. 593 (1989)..............................................................................37

*Brown v. Ramsay*,
No. 4:18-cv-10279 (S.D. Fla. filed 2018)...........................................55

iii

*Camara v. Mun. Court of San Francisco*,
387 U.S. 523 (1967) ........................................................................ 58

*Campillo v. Sullivan*,
853 F.2d 593 (8th Cir. 1988) ............................................................ 7

*Carroll v. U.S.*,
267 U.S. 132 (1925) .................................................................. 60, 61

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ......................................................... 32

*City of El Cenizo, Texas v. Texas*,
890 F.3d 164 (5th Cir. 2018) ......................................................... 30

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................ 33

*City of Los Angeles v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) ......................................................... 35

*Clark v. City of Lakewood*,
259 F.3d 996 (9th Cir. 2001) ......................................................... 32

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) ...................................................................... 53

*Creedle v. Miami-Dade Cty.*,
349 F. Supp. 3d 1276 (S.D. Fla. 2018) ...................................... 30, 55

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ......................................................... 33

*Davila v. N. Reg'l Joint Police Bd.*,
370 F. Supp. 3d 498 (W.D. Pa. 2019) ............................................ 30

*Davila v. United States*,
247 F. Supp. 3d 650 (W.D. Pa. 2017) ............................................ 56

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ...................................................................... 32

iv

*Davis v. United States*,
  564 U.S. 229 (2011) .........................................................60

*Doe v. Wolf*,
  424 F.Supp.3d 1028 (S.D. Cal. 2020) .................................42

*Dunaway v. New York*,
  442 U.S. 200 (1979) ......................................................9, 55

*E.O.H.C. v. DHS*,
  950 F.3d 177 (3d Cir. 2020) ............................................43

*Esparza v. Nobles County*,
  No. A18-2011, 2019 WL 4594512 (Minn. Ct of App. Sept. 23
  2019) (unpublished) .......................................................13

*Flores v. Meese*,
  942 F.2d 1352 (9th Cir. 1991), *rev'd on other grounds*, *Reno v.
  Flores*, 507 U.S. 292 (1993) ...........................................52

*Flores-Torres v. Mukasey*,
  548 F.3d 708 (9th Cir. 2008) ...........................................42

*Florida v. Harris*,
  568 U.S. 237 (2013).............................................26, 39, 40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).......................................................33

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) ...........................................55

*Garcia v. Taylor*,
  40 F.3d 299 (9th Cir. 1994) .............................................7

*Gerstein v. Pugh*,
  420 U.S. 103 (1975)...................................................*passim*

*Glasgow v. Beary*,
  2 F. Supp. 3d 419 (E.D.N.Y. 2014) .................................28

*Green v. Dep't of Commerce*,
  618 F.2d 836 (D.C. Cir. 1980) ........................................36

*Hamdi ex rel. Hamdi v. Napolitano*,
    620 F.3d 615 (6th Cir. 2010) ................................................................43

*Haro v. Sebelius*,
    747 F.3d 1099 (9th Cir. 2014) ..........................................................33

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ............................................................37

*Henry v. United States*,
    361 U.S. 98 (1959) ............................................................................40

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ............................................................58

*Hernandez v. United States*,
    939 F.3d 191 (2d Cir. 2019) ...............................................32, 37, 55

*Herring v. United States*,
    555 U.S. 135 (2009) ..........................................................................20

*Hildreth v. Overseers of Poor of Hopewell Twp.*,
    13 N.J.L. 5 (1831) .............................................................................62

*Interstellar Starship Services, Ltd. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) ............................................................15

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ..................................................................43, 44

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
    762 F.3d 867 (9th Cir. 2014) ......................................................15, 23

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) ............................................................38

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986) ...................................................................................................39

*Lewis v. Casey*,
    518 U.S. 343 (1996) ..........................................................................49

*Lopez-Flores v. Douglas Cty.*,
 2020 WL 2820143 (D. Or. May 30, 2020) ........................................................28

*Lopez-Rodriguez v. Mukasey*,
 536 F.3d 1012 (9th Cir. 2008) .................................................................59, 60

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992).................................................................................17, 32

*Lunn v. Commonwealth*,
 477 Mass. 517 (2017) .....................................................................................13

*Lynch v. Leis*,
 382 F.3d 642 (6th Cir. 2004) ..........................................................................33

*Lyon v. United States Immigration & Customs Enf't*,
 300 F.R.D. 628 (N.D. Cal. 2014)....................................................................42

*Makowski v. United States*,
 27 F. Supp. 3d 901 (N.D. Ill. 2014) ................................................................56

*Mancusi v. DeForte*,
 392 U.S. 364 (1968)........................................................................................53

*Marshall v. Barlow's, Inc.*,
 436 U.S. 307 (1978)..................................................................................57, 58

*Martinez-Medina v. Holder*,
 673 F.3d. 1029 (9th Cir. 2011) .................................................................29, 44

*Mayorov v. United States*,
 84 F. Supp. 3d 678 (N.D. Ill. 2015).................................................................56

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) ...........................................................17, 37, 45

*Mendia v. Garcia*,
 165 F. Supp. 3d 861 (N.D. Cal. 2016).............................................................41

*Mendia v. Garcia*,
 768 F.3d 1009 (9th Cir. 2014) ..................................................................32, 38

*Millender v. Cty. of Los Angeles*,
620 F.3d 1016 (9th Cir. 2010), *rev'd on other grounds*, 132 S.Ct.
1235 (2012)........................................................................................20

*Miller v. City of Los Angeles*,
661 F.3d 1024 (9th Cir. 2011) ...........................................................31

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015)......................................................*passim*

*Morales v. Chadbourne*,
996 F. Supp. 2d 19 (D.R.I. 2014), *aff'd in part, dismissed in part*,
793 F.3d 208 (1st Cir. 2015)..............................................................41

*N.S. v. Hughes*,
No. 1:20-cv-101-RCL, 2020 WL 2219441 (D.D.C. May 7, 2020).............46, 53

*Nadarajah v. Gonzales*,
443 F.3d 1069 (9th Cir. 2006) ...........................................................43

*Nicholson v. City of Los Angeles*,
935 F.3d 685 (9th Cir. 2019) .............................................................57

*Nielsen v. Preap*,
139 S. Ct. 954 (2019)........................................................................42

*Orhorhaghe v. INS*,
38 F.3d 488 (9th Cir. 1994) .........................................................20, 59

*Ortega v. ICE*,
737 F.3d 435 (6th Cir. 2013) .............................................................55

*Ortega-Melendres v. Arpaio*,
836 F. Supp. 2d 959 (D. Ariz. 2011) ..................................................39

*Padilla v. Immigration & Customs Enf't*,
953 F.3d 1134 (9th Cir. 2020) ...........................................................49

*Parham v. J.R.*,
442 U.S. 584 (1979)..........................................................................57

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .............................................................16

*People v. Jones*,
443 N.Y.S.2d 298 (N.Y. City Crim. Ct. 1981) ..................................................20

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) ..........................................................59

*Pitts v. Terrible Herbst, Inc.*,
653 F.3d 1081 (9th Cir. 2011) ..........................................................42

*Pub. Interest Research Grp. Of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
123 F.3d 111 (3d Cir. 1997) ..............................................................36

*Ramon v. Short*,
399 Mont. 254 (2020) ....................................................................13

*Rockwell Int'l Corp v. United States*,
549 U.S. 457 (2007)........................................................................33

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010) ..................................................47, 48, 49

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ............................................................7

*Schall v. Martin*,
467 U.S. 253 (1984)............................................................19, 56, 57

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
402 F.3d 1198 (Fed. Cir. 2005) ......................................................32

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) (Gorsuch, J., concurring in part) ..................................63

*Shadwick v. City of Tampa*,
407 U.S. 235 (1972)............................................................52, 64, 65

*Smith v. Kelly*,
2012 WL 1605123 (W.D. Wash. May 8, 2012) ..............................................28

*Smith v. Oklahoma City*,
696 F.2d 784 (10th Cir. 1983) ..........................................................20

*Southern Utah Wilderness Alliance v. Palma*,
  707 F.3d 1143 (10th Cir. 2013) .......................................................... 33

*State v. Klinker*,
  85 Wash.2d 509 (1975) ...................................................................... 57

*Stone v. Holzberger*,
  23 F.3d 408 (6th Cir. 1994) (unpublished) ......................................... 57

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971) ............................................................................... 35

*Tejeda-Mata v. INS*,
  626 F.2d 721 (9th Cir. 1980) ....................................................... 40, 59

*United States v. Brignoni-Ponce*,
  422 U.S. 873 (1975) (applying *Terry v. Ohio*, 392 U.S. 1 (1968)) ........ 59, 60, 61

*United States v. Esquivel-Rios*,
  725 F.3d 1231 (10th Cir. 2013) (Gorsuch, J.) .............................. 19, 20

*United States v. Houser*,
  804 F.2d 565 (9th Cir. 1986) ............................................................. 35

*United States v. Lee*,
  821 F.3d 1124 (9th Cir. 2016) ........................................................... 28

*United States v. Montero-Camargo*,
  208 F.3d 1122 (9th Cir. 2000) ........................................................... 41

*United States v. Ortiz*,
  422 U.S. 891 (1975) ........................................................................... 59

*United States v. Ramsey*,
  431 U.S. 606 (1977) ........................................................................... 59

*Uroza v. Salt Lake Cty.*,
  2014 WL 4457300 (D. Utah Sept. 10, 2014) ...................................... 56

*Vazquez-Mentado v. Buitron*,
  2013 WL 2318636 (N.D.N.Y. May 28, 2013) .................................... 56

*Virginia v. Moore*,
  553 U.S. 164 (2008)..............................................................2, 17, 28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..........................................................................38

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)..........................................................................34

*People ex rel. Wells v. DeMarco*,
  168 A.D.3d 31 (N.Y. App. Div. 2018) ............................................13

*Welsh v. Wisconsin*,
  466 U.S. 740 (1984)..........................................................................29

*Wilson v. Arkansas*,
  514 U.S. 927 (1995).....................................................................61, 62

*Zepeda v. INS*,
  753 F.3d 719 (9th Cir. 1983) .......................................................46, 59

**Statutes**

8 U.S.C. § 1101(b)(4)...........................................................................52

8 U.S.C. §§ 1221-1232 .........................................................................47

8 U.S.C. § 1225(b)(1)(B)(ii) Part IV...........................................47, 48, 49

8 U.S.C. §§ 1226 and 1231 ..............................................................47, 48

8 U.S.C. § 1226(a) ...............................................................................53

8 U.S.C. §§ 1227(a)(2), 1227(a)(5), 1182(a)(2), 1182(a)(4) ...................62

8 U.S.C. § 1252(a)(1)............................................................................43

8 U.S.C. § 1252(b)(9)..................................................................42, 43, 44

8 U.S.C. § 1252(f)(1) ...................................................................18, 47, 48, 49

8 U.S.C. § 1357(a)(2)......................................................................10, 53

8 U.S.C. § 1357(d) ...............................................................................47

28 U.S.C. § 1291 ...................................................................... 3

28 U.S.C. § 1331 ...................................................................... 3

2019 Reg. Sess., § 6(10) (Wash. 2019) ................................ 12

Act of Feb. 5, 1917, ch. 29, § 19, 39 Stat. 889 ................... 64

Act of Feb. 20, 1907, ch. 1134, § 20, 34 Stat. 904 ............. 64

Act of Mar. 3, 1903, ch. 1012, § 21, 32 Stat. 1218 ............. 64

Act of Mar. 11, 1774, ch. 590, § 23, 1774 N.J ................... 61

Act of May 10, 1920, ch. 174, 41 Stat. 593 ........................ 64

Act of Oct. 16, 1918, ch. 186, § 2, 40 Stat. 1012 ............... 64

Act of Oct. 19, 1888, ch. 1210, 25 Stat. 566 ...................... 64

Ala. Code § 22-52-7(a) .......................................................... 58

Alien Friends Act ................................................................... 63

Alien Friends Act § 2 ............................................................. 63

An Act Concerning Aliens, ch. 58, 1 Stat. 570, § 1 (1798).... 63

Cal. Welf. & Inst. Code § 5206 ............................................ 58

Georgia, Act of Feb. 10, 1787, 1787 Ga. Laws 40 .............. 62

Internal Security Act of 1950, ch. 1024, § 22, 64 Stat. 1008 .... 65

Massachusetts, Act of Feb. 26, 1794, ch. 32, 1794 Mass. Acts ............ 62

Mont. Code Ann. § 53-21-122 ............................................... 58

New York, Act of Mar. 7, 1788, ch. 62, 1788 N. ................ 62

Va. Code Ann. § 37.2-808 ...................................................... 58

Vermont, Act of Mar. 3, 1797, ch. XLVII, 1797 Vt. Acts & Resolves
   370............................................................................................. 62

W. Va. Code Ann. § 27-5-2(c) ...................................................................58

**Other Authorities**

8 C.F.R. § 287.3(a) ...................................................................................54

8 C.F.R. § 287.3(b), (d) ...............................................................................6

8 C.F.R. § 287.5(e)(2)(i)-(lii) .....................................................................52

8 C.F.R. § 287.5(e)(2)(lii) .............................................................................6

8 C.F.R. § 287.7(b) ...................................................................................52

8 C.F.R. § 287.7(b)(6) .................................................................................6

8 C.F.R. § 287.7(d) ...............................................................................6, 54

8 C.F.R. § 299.1 (1996) ...............................................................................7

8 C.F.R. § 1003.10 .......................................................................................7

8 C.F.R. § 1240.1(a) .................................................................................52

Fourth Amendment ...........................................................................*passim*

Fifth Amendment .......................................................................................29

Fed. R. App. P. 4(a)(1)(B)(ii) .......................................................................3

Fed. R. Civ. P. 54(b) .................................................................................35

## INTRODUCTION

Immigration and Customs Enforcement ("ICE") asks this Court to free it completely from the constraints of the Constitution. For more than a decade, ICE has instigated hundreds of thousands of unconstitutional arrests at the click of a button and based on nothing more than database searches. No interview is performed, the immigration file is never checked, and no neutral and detached official ever reviews whether probable cause exists for the arrest. The predictable result is that, in recent years, ICE has mistakenly targeted thousands of U.S. citizens and non-citizens who cannot be removed. From its self-described "cubicle farm" at its Pacific Enforcement Response Center ("PERC") in Laguna Niguel, California, ICE agents churn out thousands of detainers each week asking jails and prisons across the country to arrest and detain people in their custody for multiple days. ICE only bothers to pick up a mere 20% of the people it subjects to these detentions. Following a seven-day trial, the district court found that this automated system of detainer arrests violates the Fourth Amendment because the databases it uses are too unreliable to supply probable cause.

This was not a close call. Reams of evidence at trial—largely from the government's own reports and witnesses—revealed stunning gaps and errors in the databases ICE uses for determining probable cause. In issuing detainers, ICE agents do not review any database that reliably records U.S. citizenship. And the primary

databases it does consult have error rates as high as 42 percent, delete pertinent information, fail to update as people's immigration status changes, and contain a host of other problems. On appeal, as at trial, ICE does not dispute this evidence. Nor does it identify any evidence establishing reliability that the district court failed to consider. Instead, ICE primarily raises meritless objections to standing and class certification, which provide no basis to vacate an injunction protecting thousands from unconstitutional arrests.

ICE also challenges the district court's alternative basis for the injunction: that ICE violates the Fourth Amendment by issuing detainers to state and local officials who have no authority under state law to make civil immigration arrests. The Court need not reach this claim, but if it does, it should affirm. ICE's only argument to the contrary is based on *Virginia v. Moore*, but *Moore* is about criminal arrests. 553 U.S. 164 (2008). It does not address civil arrests like those at issue here.

ICE suggests that the injunction should be overturned because it "harms the United States' ability to enforce the immigration laws." Gov. Br. 5. But ICE has no special exemption from the Fourth Amendment. And nothing about the district court's injunction prevents ICE from using all the other enforcement and collaboration tools it has relied on for decades. It can still coordinate arrests with prisons and jails. It can interview individuals in state and local custody. It can issue detention requests that satisfy the core requirements of the Fourth Amendment. And

most important, it can issue detainers that ask for advance notice of people's release. Indeed, ICE relied on such notice-only detainers for decades prior to its current regime, between 2015 to 2017, and again since the injunction. The injunction simply prevents ICE from depriving people of their liberty in violation of specific Fourth Amendment protections—most of whom (80%) ICE does not even pick up.

Finally, ICE's sloppy detainer practices have been enabled by a total absence of outside review. This is the subject of Plaintiffs' cross-appeal. ICE's detainer arrests violate the rule that probable cause for an arrest must be promptly reviewed by an independent, neutral official. *Gerstein v. Pugh*, 420 U.S. 103, 114-15 (1975). This rule is one of the Fourth Amendment's core guarantees against arbitrary arrest. It applies to arrests of all kinds, both criminal and civil, including immigration arrests dating back to the Founding. And it is crucial to enforce here. ICE's careless detainer arrests and widespread errors are precisely what neutral review is intended to prevent.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. On February 5, 2020, the district court issued its final judgment. ER 5. Plaintiffs timely cross-appealed on March 3, 2020. SER 4; Fed. R. App. P. 4(a)(1)(B)(ii).

## STATEMENT OF THE ISSUES PRESENTED

**Counterstatement of Issues on Appeal**

1.      Whether the district court clearly erred in finding that ICE relies on unreliable databases to issue detainers, where extensive record evidence establishes the databases are outdated, incomplete, and full of errors.

2.      Whether the district court erred in enjoining the issuance of database detainers to state or local officers who lack state law authority to make the requested arrests for civil immigration violations.

3.      Whether Plaintiff Gonzalez, who filed this suit when he was in pretrial criminal custody and subject to imminent arrest based on an immigration detainer, which was preventing him from posting bail, has standing.

4.      Whether the district court abused its discretion in holding that the Probable Cause Subclass and Plaintiff Gonzalez satisfy Rule 23's commonality and typicality requirements, where Gonzalez and all subclass members are asserting the identical claim that ICE detainers based solely on unreliable databases lack probable cause.

5.      Whether the injunction, which provides relief only to class members subject to Fourth Amendment violations, is overbroad.

**Statement of Issue on Cross-Appeal**

1.  Whether ICE violates the Fourth Amendment by failing to provide neutral review of detainer arrests, where the Fourth Amendment requires a neutral determination of probable cause for all arrests.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes that were not included in the government's addendum are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I. Factual Background

### A. ICE's Use of Detainers.

Immigration detainers are requests that ICE sends to federal, state, and local criminal justice entities. ER 15 ¶7. The detainers at issue here ask the recipient to hold a person in jail or prison past the time they would normally be released—whether because they post bail, have charges dropped, are acquitted, or finish their sentence—to give ICE time to pick the person up. ER 15 ¶7. This request is conveyed using a check-box form. ER 15 ¶8.

The detainers challenged in this case are primarily lodged by ICE officers at the Pacific Enforcement Response Center ("PERC") in Laguna Niguel, California. ER 15-16 ¶¶11-13. The PERC issues detainers to over 40 states based on nothing more than electronic database checks. *Id.* Unlike other ICE entities, the PERC never

conducts interviews or any other investigation before issuing detainers.  ER 16 ¶¶12-13.

Detainers result in a new arrest by the receiving agency, followed by days of extra detention.  ER 15 ¶7; *see Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015).  ICE's detainer regulation contemplates that this extra detention will last up to five days.  8 C.F.R. § 287.7(d).  Current ICE policy, adopted after this case was filed, limits the requested detention to 48 hours.  ER 64 ¶31.

Detainers can be issued by any "[i]mmigration enforcement agent[]."  8 C.F.R. § 287.7(b)(6).  Under current ICE policy, adopted during this lawsuit, detainers are accompanied by an ICE administrative "warrant," which is issued by an "[i]mmigration enforcement agent[]," or another type of ICE agent.  8 C.F.R. § 287.5(e)(2)(lii); *see* SER 954 ¶5.2.

No neutral, independent official reviews whether ICE has probable cause to issue the detainer—not before and not after the arrest.  ER 56 ¶¶5-6; SER 786-87, 807-08.  If a person is transferred to ICE's physical custody, an ICE agent decides within an additional 48 hours whether to issue a Notice to Appear—the charging document that commences removal proceedings—and whether to continue detaining the person or set bond.  8 C.F.R. § 287.3(b), (d); SER 808 ¶¶9-12.  For a person who remains detained, it can take several weeks or months before the individual's first

appearance before an immigration judge. SER 808 ¶13, 814 ¶4, 87:22-25.[1] Immigration judges are administrative officers within the Department of Justice who review bond determinations and adjudicate removal proceedings. 8 C.F.R. § 1003.10. Once in removal proceedings, a person may be detained for months or even years pending adjudication of their removal case. *See, e.g., Rodriguez v. Robbins*, 715 F.3d 1127, 1131 (9th Cir. 2013) (discussing prolonged detention during removal proceedings).

## B. Changes to ICE's Detainer Regime.

The federal government's use of immigration detainers has changed dramatically in recent years. For many decades, immigration detainers requested only advance notice of people's release dates, not detention. *See* Request for Judicial Notice, filed concurrently, Exh. A (1983 detainer); 8 C.F.R. § 299.1 (1996) (1996 regulation listing 1983 detainer form as version still in use); *Garcia v. Taylor*, 40 F.3d 299, 304 (9th Cir. 1994) ("The detainer notice does not. . . ask the warden to hold a petitioner") (quotation marks omitted); *Campillo v. Sullivan*, 853 F.2d 593, 594 (8th Cir. 1988) (detainer "for notification purposes only"). In 1997, the Immigration and Naturalization Service issued a new detainer form that asked

---

[1] First appearances in immigration court are known as master calendar hearings, in which a person admits or denies the government's charges of removability, much like an arraignment hearing in criminal court. *See* Immigration Court Practice Manual § 4.15.

receiving agencies to detain people for 48 hours, excluding weekends and holidays. *See* Request for Judicial Notice, Exh. B (1997 detainer). Between 2015 and 2017, ICE resumed the use of notice-only detainers to address constitutional concerns with detainer arrests. ER 62-63. And since the injunction in this case, ICE is again issuing notice detainers to members of the Probable Cause Subclass. SER 819 ¶11, 842.

ICE's use of detainers exploded in the late 2000s. Until that point, ICE policy and practice required agents to interview a person before issuing a detainer to make sure the person was subject to removal. ER 18 ¶¶31-33. That changed in 2008, when DHS inaugurated a new program, Secure Communities, to automate detainer arrests. ER 18 ¶28-29. The program linked DHS databases with the FBI's nationwide fingerprint database, which receives fingerprints from state and local law enforcement agencies after bookings. ER 16-18 ¶¶17, 26-27. As a result of this link, any person arrested anywhere in the United States now has their fingerprints and associated personal information automatically checked against DHS databases. ER 18 ¶29-30, 23 ¶69-70.

ICE, now receiving millions of fingerprints per year, began issuing detainers based solely on these automatic database checks without conducting any interviews or even checking people's immigration files (known as "A Files"). ER 16-17 ¶20, 22. And its issuance of detainers increased exponentially. In FY 2005, ICE issued

on average less than 600 detainer per month.  SER 1286.[2]  But by the end of FY 2008, ICE was issuing nearly 20,000 per month.  *Id.*  And by the end of FY 2011, the monthly total exceeded 26,000.  *Id.*

### C.  Automation and the Absence of Any Neutral Review of Detainer Arrests Have Enabled Troubling Practices.

These changes, combined with a lack of any neutral and detached review of ICE's detainer decisions, has enabled a system of mass arrests rife with error and abuse.  The result has been a steep increase in mistakes and unlawful incarceration.

First, for many years ICE issued detainers without any attempt to obtain probable cause, until this lawsuit and others forced ICE to change its practices.  *See* ER 62 ¶¶19-21.  Until December 2012, ICE issued detainers based only on the "initiat[ion]" of an "investigation."  ER 56 ¶¶8-9, 62 ¶19; SER 947 (2011 detainer form).  The law has been clear for forty years that opening an investigation does not create probable cause.  *See Dunaway v. New York*, 442 U.S. 200, 214-16 (1979).  And yet ICE issued hundreds of thousands of detainers on precisely that basis.  SER 1285-86.  It also issued tens if not hundreds of thousands of detainers based solely on a person's foreign birth and lack of records in DHS databases—evidence that

---

[2] This evidence is from a searchable online collection of ICE detainer statistics, located at https://trac.syr.edu/phptools/immigration/detain/.

falls far short of probable cause, as ICE now admits.  ER 64 ¶¶31-32, 127.  ICE did not change these practices until 2014.  ER 19 ¶39, 127-28; SER 959.

Second, until 2017, ICE defied the statutory constraints on detainer arrests. Under 8 U.S.C. § 1357(a)(2), ICE may not make an arrest without an administrative warrant unless it determines that the person is likely to escape before a warrant can be obtained.  ICE never made those determinations, ER 129, yet nonetheless issued over two million detainers without administrative warrants for two decades.  SER 1285-86.  In 2017, ICE changed its policy to require administrative warrants alongside detainers in response to litigation in this case and another class action in Illinois.  SER 952 ¶2.4 & n.2; ER 129 (district court holding that "ICE's practices were in contravention of 8 U.S.C. section 1357(a)(2)").

Third, the ease of automation and lack of outside review has led ICE to issue far more detainers than it actually acts on.  ICE witnesses admitted at trial that ICE does not take custody of nearly *80 percent* of the people for whom the PERC issues detainers.  SER 961, 962-1070, 62:6-24 (Defendant David Marin confirming figure), 50:15-51:15 (ICE witness Timothy Robbins) (same).  These individuals are subject to multiple extra days of imprisonment for no reason.

Fourth, since it began issuing detainers based on database checks alone, ICE's detainer arrests have targeted thousands of U.S. citizens and lawful permanent residents, who have been subject to days, weeks, or months of unlawful

imprisonment as a result. *See* ER 33-34 ¶¶128-32; *infra* n.20 The evidence at trial demonstrated that ICE relies on databases that are filled with errors, omit huge categories of information, fail to update as people's citizenship and immigration status change, and delete critical information. In an ICE witness's own words, these shortcomings "frequently" result in detainers being placed on U.S. citizens. ER 29 ¶¶102-03.

### D. ICE's Current Use of Databases to Assess Probable Cause.

At trial, the district court examined voluminous evidence related to the PERC's current practices of issuing detainers based on nothing more than database checks. The district court reviewed the ten databases PERC automatically checks and numerous others that agents can manually check, and found that "the aggregation of information ICE receives from the databases is largely erroneous" and fails to capture key pieces of information, such as U.S. citizenship. ER 32 ¶126. The district court concluded the databases were too incomplete and inaccurate to support probable cause on their own. ER 33 ¶127.

For instance, the court found the database used to identify non-citizens who remain after their visa expires "incorrectly identified visa overstays more than 42 percent of the time." ER 31 ¶115. The database ICE uses for naturalization and immigration status is "outdated," "antiquated," and "not updated appropriately," and deletes information entirely after 15 years. ER 30 ¶¶108-10. Its error rate is "close

11

to 30 percent." ER 30 ¶109. And the "central database ICE relies on" contains entries that are "often erroneous," "incomplete and inaccurate," "frequently" miss U.S. citizenship, and misclassify "thousands and thousands of people, potentially even millions." ER 28 ¶¶97-98, 29 ¶103, 44-45 ¶16. Other databases ICE consults "provide extremely limited information," include "no information" after 1995, or do no more than summarize the information in other databases. ER 15 n.12.

Compounding these enormous error rates, the Department of Homeland Security ("DHS") has no database that shows who is and is not a U.S. citizen. ER 32 ¶¶121-122. This is a critical gap, because "identifying that a person is not a U.S. citizen" is "[p]aramount in determining probable cause of removability." ER 20 ¶42. PERC agents thus issue detainers without the most crucial data point of all, because they rely exclusively on databases that often do not capture citizenship, and they do not check any paper records or conduct any interviews.

### E.    State Laws on Civil Immigration Arrests.

In response to concerns about the constitutionality of ICE detainers, some states have taken steps to explicitly prohibit their law enforcement agencies from making arrests on detainers, including California, Illinois, Washington, and Colorado. SER 93:5-18, 462-64; S.B. 5497, 66 Leg., 2019 Reg. Sess., § 6(10) (Wash. 2019); H.B. 19-1124, Title 24, Art. 76.6, §102 (Colo. 2019). Other states, by contrast, have passed laws requiring or permitting law enforcement officials to

12

comply with immigration detainers, such as Texas, Tennessee, Iowa, Alabama, and Florida. SER 461-62 ¶¶10-14; H.B. 168, Ch. 908, § 104(4) (Fla. 2019). Meanwhile, in yet other states, like Massachusetts, Montana, New York, and Minnesota, state courts have held that existing state laws do not authorize state and local law enforcement officials to comply with immigration detainers. *Lunn v. Commonwealth*, 477 Mass. 517, 530-32 (2017); *Ramon v. Short*, 399 Mont. 254, 273-74 (2020); *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 42-43 (N.Y. App. Div. 2018); *Esparza v. Nobles County*, No. A18-2011, 2019 WL 4594512, at *7 (Minn. Ct of App. Sept. 23 2019) (unpublished).

## II. Procedural History

Plaintiffs Gerardo Gonzalez and Simon Chinivizyan are both U.S. citizens to whom ICE issued immigration detainers. ER 14, 55. Both were in local law enforcement custody and subject to detainers at the time they entered this lawsuit. ER 55 ¶1, 61 ¶13. Plaintiffs represent classes of current and future individuals with ICE detainers issued by an ICE agent located in the Central District of California. ER 52-53. The classes exclude individuals with removal orders and individuals who are subject to ongoing removal proceedings, for whom the probable cause and neutral review analysis may differ. *Id.* Both plaintiffs represent the Judicial Determination Class, which is comprised of individuals whose detainers are not based on removal orders or ongoing removal proceedings. *Id.* Plaintiff Gonzalez

represents the Probable Cause Subclass, which is comprised of individuals whose detainers were issued solely on the basis of electronic database checks. *Id*.

In 2017, the district court granted summary judgment against the Judicial Determination Class on its claim that ICE violates the Fourth Amendment by issuing detainers without a neutral determination of probable cause. SER 804. The Court held neutral review was unnecessary because "courts frequently defer" to the political branches in immigration matters. SER 803.

Subsequently, Judge Beverly Reid O'Connell passed away and this case was reassigned to Judge André Birotte Jr. ER 686.

In May 2019, the district court held a 7-day bench trial on two Fourth Amendment issues brought on behalf of the Probable Cause Subclass: (1) whether the databases ICE uses to issue detainers are unreliable for probable cause determinations, and (2) whether ICE violates the Fourth Amendment by issuing detainers to states and localities that lack state law authority to make arrests for civil immigration violations. ER 13. On the first issue, the Court heard testimony from ten witnesses. SER 191-93. Four defense witnesses testified about ICE's current database practices. SER 193, 663-65. The Court also considered 145 stipulated facts, deposition excerpts for 14 ICE witnesses, and 186 exhibits, including 41 government reports on the databases. ER 55-77; SER 238-96, 194-234.

14

On September 27, 2019, the Court ruled for Plaintiffs, issuing 37 pages of findings of fact and conclusions of law. It found that, "[a]ll told, the collection of datapoints ICE gathers from the various databases does not provide affirmative indicia of removability to satisfy probable cause." ER 32 ¶126. It also concluded that ICE violated the Fourth Amendment by issuing detainers to state and local law enforcement agencies that lack state law authority to make the requested arrests. ER 41 ¶22. On both claims, the court ordered ICE to rescind database detainers issued to the Probable Cause Subclass and enjoined ICE from issuing any further such detainers. ER 8. That is, the relief on both claims is the same.

ICE sought a stay, which this Court denied except to the extent the injunction was based only on the state law claim. SER 10.

## STANDARD OF REVIEW

This Court reviews factual findings for clear error, which only exists if the factual findings were "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (internal quotation marks omitted). The Court reviews the grant of summary judgment de novo, *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc), and reviews the grant of a permanent injunction and class certification for abuse of discretion. *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002). When reviewing a

grant of class certification, the Court "accord[s] the district court noticeably more deference than when [it] review[s] a denial of class certification." *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014).

## SUMMARY OF THE ARGUMENT

**ICE'S APPEAL:**

The Court should affirm the injunction, which rests on careful factual findings and well-settled Fourth Amendment principles. The injunction is necessary to protect thousands of class members from unlawful detention and leaves ICE numerous avenues to enforce immigration law.

I.    The district court correctly held that ICE violates the Fourth Amendment rights of the Probable Cause Subclass.

A. Undisputed principles of Fourth Amendment law establish that probable cause must be based on reliable information. And the district court did not clearly err in finding that the databases ICE uses to issue detainers are unreliable. The district court examined voluminous and startling evidence showing widespread problems with these databases. ICE points to no evidence establishing reliability that the court ignored.

B. Because the state authority claim is merely an alternative basis for the injunction, the Court need not reach it, but if it does it should affirm. The district court correctly held that detainers seeking arrests by state and local officers who lack state law authority to make such arrests violate the Fourth Amendment. ICE's

16

principal authority to the contrary, *Virginia v. Moore*, 553 U.S. 164 (2008), is inapposite because it addressed criminal, not civil, arrests.

II.     The district court did not abuse its discretion in issuing the injunction.

A. Plaintiff Gonzalez has standing. When he filed this suit, he was in pretrial criminal custody and subject to an immigration detainer, which was causing him ongoing and imminent harm. His standing is assessed "as of the commencement of suit," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992), and subsequent amendments to the complaint do not defeat his standing.

B. Having consistently concluded Plaintiff Gonzalez had standing to seek rescission of his detainer, and subsequently certified a class that includes future class members, the district court did not abuse its discretion in tailoring the injunction to prevent ICE from issuing detainers to class members in the first place, rather than allowing ICE to issue unconstitutional detainers only to immediately rescind them.

C. ICE's concession that a Fourth Amendment seizure occurs when a person is detained on an immigration detainer resolves its argument that Plaintiff Gonzalez was never seized. Gov. Br. 26. It is axiomatic that an injunction may issue to protect a plaintiff from ongoing *or* imminent harm; a court need not wait until an illegal seizure occurs before enjoining it. *Melendres v. Arpaio*, 695 F.3d 990, 997-99 (9th Cir. 2012).

D.   The district court did not abuse its discretion in certifying the Probable Cause Subclass.  Commonality is met because class members, each of whom was issued a detainer "solely on the basis of electronic database checks," raise a common challenge to ICE's practice of issuing detainers based solely on unreliable databases.  ER 6 n.1.  Plaintiff Gonzalez, whose detainer was also based solely on such databases, is typical of the class.

E. The injunction is not overbroad.  The relief granted goes only so far as necessary to remedy the plaintiff class's unconstitutional arrests and leaves most of ICE's enforcement tools untouched.  Nor does 8 U.S.C. § 1252(f)(1) bar the class-wide injunction, because the district court did not enjoin the operation of any statute, and the only statute that even mentions detainers is outside the reach of § 1252(f)(1).

**PLAINTIFFS' CROSS-APPEAL:**

I.   The Court should reverse the grant of summary judgment to Defendants on Plaintiffs' neutral determination Fourth Amendment claim.

A.   ICE detainer arrests violate the Fourth Amendment requirement that probable cause for an arrest be promptly reviewed by a neutral and detached official.  *Gerstein*, 420 U.S. at 114-15.  It is undisputed that ICE officers issue detainers entirely on their own, with no review by a neutral official.  This lack of oversight has led to the exact problems neutral review is intended to prevent: careless arrests and widespread errors.

18

B.     *Gerstein's* requirement of neutral review applies equally to civil arrests of all kinds, *see Schall v. Martin,* 467 U.S. 253, 257 n.4 (1984), including immigration arrests dating back to the Founding.  Its rule is consistent with *Abel v. United States*, which affirmed that an "independent" official had to review "deportability" prior to any arrest.  362 U.S. 217, 232, 236-37 (1960).  An executive official can review probable cause, as long as the official is neutral and independent, but no neutral officer does so under ICE's detainer practices.

## ARGUMENT

## I.     ICE DETAINERS VIOLATE THE FOURTH AMENDMENT RIGHTS OF THE PROBABLE CAUSE SUBCLASS.

### A.     The District Court Correctly Held ICE Violates the Fourth Amendment by Issuing Detainers Based on Outdated, Incomplete, Error-filled Databases.

1.     The district court correctly held, after a 7-day bench trial, that the "patchwork web of databases" ICE uses to issue detainers are unreliable to support probable cause, and therefore enjoined ICE from issuing detainers based solely on those databases to members of the Probable Cause Subclass.

That holding rests on settled Fourth Amendment principles.  As ICE concedes, probable cause must be based on "reasonably trustworthy information."  Gov. Br. 46.  The detainers issued to the Probable Clause class are based *only* on ICE databases.  Thus, if those databases are not reliable, they cannot establish probable cause for a detainer.  *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1236, 1238

(10th Cir. 2013) (Gorsuch, J.) (where officer "relied *only* on [a] database report to support his stop," the Fourth Amendment question "hinges entirely on the reliability of a computer database"); *Arizona v. Evans*, 514 U.S. 1, 17 (1995) (O'Connor, J., concurring) ("Surely it would *not* be reasonable for the policy to rely, say, on a recordkeeping system . . . that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests."); *Herring v. United States*, 555 U.S. 135, 146 (2009) ("In a case where systematic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system."). For each member of the Probable Cause class, the reliability of the databases is thus dispositive of the Fourth Amendment question.

Courts consider several factors in assessing the reliability of a database: (1) whether the database contains a "complete set of pertinent information," ER 32 ¶¶4-5; *see, e.g., Orhorhaghe v. INS*, 38 F.3d 488, 499 (9th Cir. 1994) (database unreliable because data incomplete); *Esquivel-Rios*, 725 F.3d at 1235 (similar); (2) the degree of error and inaccuracies, *see, e.g., People v. Jones*, 443 N.Y.S.2d 298, 304 (N.Y. City Crim. Ct. 1981) (granting suppression because system's 20% inaccuracy rate was "unquestionably substantial"); (3) the failure to maintain up-to-date information about facts that change over time, *see, e.g., Smith v. Oklahoma City*, 696 F.2d 784, 787 (10th Cir. 1983); and (4) the intended purpose for which the database was designed, *see, e.g., Millender v. Cty. of Los Angeles*, 620 F.3d 1016, 1029 n.7 (9th

Cir. 2010), *rev'd on other grounds*, 132 S.Ct. 1235 (2012) (database unreliable because "not designed to provide users with information upon which official action may be taken").

The district court evaluated each of these reliability factors and found stunning errors and gaps in ICE's databases. Entire categories of information were missing. Overall error rates in some of the primary databases ranged from 30% to 42%. ER 30 ¶109, 31 ¶115. Some databases deleted crucial information or failed to update as a person's citizenship and immigration status changed. *See* ER 28-30 ¶¶100-09, 37 ¶150. None of the databases were designed to supply probable cause for arrest. ER 30 ¶¶105-06, 43-44 ¶10. The databases thus "suffer from structural flaws, incompleteness, and pervasive errors that render the databases unreliable." ER 46 ¶22.

As the court explained, probable cause of removability requires a determination that a person (1) is not a U.S. citizen and (2) is removable because of or in spite of their immigration status, both of which are "complex inquiries." ER 20 ¶¶42-43, 44 ¶12, 46 ¶26. But as ICE does not dispute, "[n]o single database contains all th[is] information," and "no one piece of information provides ICE probable cause to issue a detainer." ER 33 ¶127. PERC agents therefore piece together snippets of information from different databases designed for other

21

purposes to analyze a person's citizenship and immigration status. ER 46 ¶26. That information is inadequate at every turn.

Critically, ICE's databases are dramatically incomplete and inaccurate sources of information about who is a U.S. citizen. No databases contain complete information about *any* categories of U.S. citizens. There is no national database of all U.S.-born citizens. ER 32 ¶121.[3] Nor is there a database of foreign-born U.S. citizens who acquire or derive citizenship, of which there are at least 4.5 million living in the United States. ER 32 ¶122, 75 ¶115; SER 459 ¶2, 461 ¶9, 1253. Worse still, the databases erroneously report derivative citizens as non-citizens most of the time, because the government does not update its databases when children derive citizenship from their parents. ER 44-45 ¶16, 28 ¶100, 34 ¶132; SER 73:9-78:4, 907-08. The database regarding naturalized citizens (CLAIMS 4), who make up 6% of the total U.S. population, SER 459 ¶1, 911, destroys information after 15 years, meaning it does not include any naturalizations that occurred before 2005. ER 30 ¶110, 37 ¶150, 70 ¶75. *See* SER 1292. Only one other database sometimes shows naturalization information (CIS), but it is patently unreliable for multiple reasons. ER 27-30. These gaps and errors are precisely why U.S. citizens are so "frequently"

---

[3] A sample of 59 detainers issued by the PERC to U.S. citizens revealed 22 pertained to U.S.-born citizens. SER 1085-91.

subject to ICE's database detainers, in the words of Defendant David Marin. ER 29 ¶103, 33-34 ¶¶128-32; SER 1072-92.

The district court found the databases similarly unreliable to determine immigration status. In 2017, DHS itself found that the database ICE uses for information about visa overstays (ADIS) is wrong *42% of the time*. ER 31 ¶115; SER 1122, 1102, 1107, 1110. The databases ICE uses to identify lawful permanent residents and people with protected status (CIS and CLAIMS 3) are unreliable because both contain high error rates, lack historical information, and are not updated appropriately, according to ICE's own witness and significant other evidence. ER 30 ¶¶107-111 (CLAIMS 3 findings), 27-31 ¶¶92-105 (CIS findings); 32 ¶125. *See* SER 442:17-444:8 (ICE 30(b)(6) testifying that CIS and CLAIMS have 30% error rate and are "outdated," "antiquated," "not updated appropriately"). And information about asylees and refugees is lacking because ICE does not even check the one database that tracks that information. ER 32 ¶¶123-124.

The natural result of ICE's reliance on these flawed databases is that they predictably identify people as removable, who are not.

2. Unable to contest the governing legal principles, ICE challenges the district court's factual findings. But it does not come close to establishing the district court's findings to be "illogical, implausible, or without support." *La Quinta*, 762 F.3d at 879 (clear error standard). The district court's 24 pages of factual findings are

23

supported by extensive record evidence, much of which comes straight from the government's own witnesses and reports.

First, ICE claims that the district court failed to consider evidence of current database practices. Gov. Br. 44-45, 50. Yet ICE fails to identify a *single* piece of evidence establishing the reliability of its current practices that the district court should have considered but did not. Nor did ICE dispute at trial the substantial evidence about unreliability. *See, e.g.,* SER 65:11-70:3 (Defendant David Marin testifying he lacked knowledge of database reliability); SER 54:20-59:7 (ICE witness Timothy Robbins agreeing to same); SER 1300:10-1301:22 (DHS witness Patrick Nemeth not testifying at all about the relevant databases).

Further, as is plain from the court's opinion itself, the court meticulously evaluated evidence about *all* the databases ICE currently uses: the ten databases the PERC automatically checks, as well as numerous others ICE claimed it could manually check. ER 25-33 ¶¶78-127 & n.12, 68 ¶56, 69-73 ¶¶65-102. The court analyzed the primary databases ICE relies on in great detail. Many of the other databases had little relevance to the probable cause analysis and so did not warrant significant discussion. For instance, several of the newly-presented databases simply provided a "portal" or a "less detail[ed]" "snapshot" of other databases; contained "extremely limited information;" contained "no information . . . after 1995;" "d[id] not reflect" the outcome of immigration proceedings; addressed small

visa categories like "students and exchange visitors;" or contained "criminal" information only.  ER 26 n.12, 27.  Others only identified people who are "in removal proceedings" or "previously deported," none of whom are members of the Probable Cause Subclass.  ER 26 n.12 (SQ11), 27 ¶88 (EOIR), 27 ¶89 (EID).[4]

Second, ICE tries to downplay the record evidence about the databases' errors, suggesting that the numerical evidence suggests an error rate of 0.5%.  Gov. Br. 45.  That is wrong.  As the district court found, the main databases on which ICE relies have error rates in the range of 30-42%.  ER 30 ¶109, 31 ¶115; SER 442:17-444:8.[5] And even the measure ICE invokes—the number of detainers PERC issues and then lifts on its own initiative—actually reveals a much more serious problem than ICE admits.  Over a 10-month period, PERC lifted 771 detainers it had issued—more than *6 percent* of the total, not 0.5%—specifically "because the individuals were either U.S. citizens or otherwise not subject to removal."  ER 33.[6]  As the district

---

[4] The government pretends the district court largely based its conclusions on a single "report from 1995."  Gov. Br. 44.  As the opinion makes abundantly clear, this is false: the court considered mountains of testimony and other documents, including government reports from 2007, 2012, 2017, and more.  The 1995 report was relevant because errors from 1995 are still present in the database today.

[5] The district court also considered a government report showing that DHS's parallel automated database system for verifying employment eligibility—using the same databases as ICE plus additional ones—was only accurate "58 percent of the time." ER 36 ¶146.

[6] These statistics reflected all PERC detainers, not those issued only to the Probable Cause Subclass.  As approximately 20 percent of PERC detainers are issued to people with removal orders and who are in removal proceedings, and those detainers

court found, and ICE does not contest, *all* of those 771 detainers were issued in error. *Id.*

Moreover, while the 6% figure alone would represent thousands of errors over the course of this litigation, the true number of U.S. citizens and non-removable people ICE has targeted is necessarily much higher. The 6% only captures cases where ICE learns of its mistake while a person is still subject to a detainer. But most often, ICE will not learn of its mistake until a person is in ICE's physical custody, after a person has already been held on a detainer. *See, e.g., infra* n.20. That is because people subject to detainers in state and local custody often have no way to communicate with ICE and are not served with copies of their detainers. *See* ER 34 ¶132; SER 152-57 (collecting evidence). Further, it is impossible to know the true number of ICE's mistakes because ICE only takes custody of 20% of the people it subjects to detainers and, even then, does not track the number of people it finds to be U.S. citizens or nonremovable.[7]

---

are less likely to be issued in error, the actual rate of lifted detainers for the class population is likely higher. SER 153 n.19.

[7] Although Plaintiffs introduced significant evidence of U.S. citizens subject to detainers, Plaintiffs did not need to prove the number of such individuals to prevail, just as an individual challenging probable cause for her arrest need not prove herself innocent to succeed. *See Harris*, 568 U.S. at 249 ("[W]e do not evaluate probable cause in hindsight, based on what a search does or does not turn up."). This is particularly so because Defendants are the only ones in a position to know this number, and they have made it impossible to determine.

Finally, unable to grapple with the district court's factfinding, ICE misrepresents its conclusions. The district court did not "suggest[] that a database system is likely categorically unreliable if it does not require in-person interviews." Gov. Br. 46. The court simply found that *these* databases were, standing alone, unreliable sources for probable cause of class members' removability. The court observed that interviews *and* A-File review were more reliable sources of information than the databases ICE checks. *See* ER 34-35. But it did not require such review to establish probable cause. ER 7-8. Indeed, the injunction leaves "numerous feasible avenues for ICE to investigate and effectively enforce immigration law." ER 47; *see infra* Part II.E.

### B. This Court Need Not Reach the State Authority Claim But, if it Does, It Should Affirm.

ICE also challenges the district court's conclusions regarding detainers issued to states where officers lack state-law authority to conduct civil immigration arrests. Its arguments are misplaced for three reasons.

First, the Court need not reach this issue at all. The state authority claim was raised by the Probable Cause Subclass, which only includes individuals issued detainers based on databases alone. ER 6 n.1. As already explained, those detainers are unlawful for a reason totally independent of the state authority question: They were issued based on fatally flawed databases that are unreliable for probable cause determinations. *Supra* Part I.A. The state authority issue is merely an alternative

27

basis for the district court's injunction, and the district court afforded no additional relief based on it. Thus, should this Court resolve the database claim in Plaintiffs' favor, it need not address the state authority claim. *See United States v. Lee*, 821 F.3d 1124, 1127 n.2 (9th Cir. 2016) (declining "to answer a constitutional question unnecessary to the disposition of this case").

Second, should the Court nonetheless reach the state authority claim, it should resolve it in Plaintiffs' favor. ICE's argument to the contrary is based on the Supreme Court's decision in *Virginia v. Moore*, 553 U.S. 164 (2008). Gov. Br. 29-30. But *Moore* is about *criminal* arrests; it does not address civil arrests, like those at issue here. Accordingly, even after *Moore,* courts have continued to hold that unauthorized arrests for *non*-criminal conduct violate the Fourth Amendment. *See, e.g.*, *Lopez-Flores v. Douglas Cty.*, 2020 WL 2820143, *54 (D. Or. May 30, 2020) (holding that *Moore* does not apply to unauthorized arrest on a civil immigration detainer); *Smith v. Kelly*, 2012 WL 1605123, at *4 (W.D. Wash. May 8, 2012) ("[A]lthough *Moore* found that state distinctions between arrestable and nonarrestable crimes did not affect the constitutionality of an arrest, this court cannot say the same of state distinctions between criminal and noncriminal conduct."); *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 608 n.6 (E.D.N.C. 2009) (same); *Glasgow v. Beary*, 2 F. Supp. 3d 419, 424 (E.D.N.Y. 2014) (holding that, post-*Moore*, the constitutionality of unauthorized civil arrests is "dubious").

The implications of the government's position are stark. If the Fourth Amendment permits arrest for *civil* violations even absent arrest authority, it would sanction arrest for a wide range of non-criminal conduct, such as a homeowner's failure to cut his grass, a dog owner's noisy animal, a store owner's minor health or safety code violations, a motorist's parking violation, a taxpayer's unknowing mistake on a tax form, and countless other civil infractions. *Cf. Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984) ("To allow a warrantless home entry [to arrest for a civil traffic offense] would be to approve of unreasonable police behavior that the principles of the Fourth Amendment will not sanction."). *Moore* does not require this result.[8]

Defendants' reliance on *Martinez-Medina v. Holder*, 673 F.3d. 1029 (9th Cir. 2011) is similarly misplaced. Gov. Br. 31. The Court in *Martinez-Medina* explained that it "need not, and d[id] not decide whether the seizure violated Petitioners' Fourth Amendment rights" because it was a suppression case, so it mattered only whether an "egregious" Fourth Amendment violation had occurred. *Id.* at 1034. Because Plaintiffs here need not prove an egregious Fourth Amendment violation, *Martinez-Medina* is inapposite.

---

[8] In the event the Court concludes otherwise, it should remand to the district court so that it may consider in the first instance Plaintiffs' alternative Fifth Amendment argument for this claim, which it has not yet considered. ER 78 n.9; SER 346 n.9 (stating basis for substantive due process claim).

Finally, ICE asserts that in general *federal* statutes permit state and local officers to make arrests on detainers, but that issue is not before this Court. Gov. Br. 31 ("state or local officers can effect arrests premised on detainers consistent with federal law"). Plaintiffs have never taken any position on whether, and under what circumstances, federal statutes may preempt or prohibit such arrests. *See* SER 165-66 n.29).[9] Plaintiffs' point is that *even if* federal law permits state and local officers to make arrests on detainers, state-law authority is still needed. Indeed, ICE has conceded throughout the course of this litigation that the detainer itself provides no arrest authority. *See* ER 41 ¶20 ("ICE concedes that a detainer itself does not provide the legal authority for a state or local officer to make a civil immigration arrest."); SER 781 ¶162 (stating Defendants' position that "[t]he detainer does not authorize, but merely requests, action by the LEA"). *See also* SER 398:14-24 (ICE 30(b)(6) witness explaining that it "would be up to the individual LEA to determine what authority or right they have to hold an individual [on an immigration detainer]

---

[9] This is an important, potentially far-reaching question, on which federal courts have reached different conclusions. *Compare, e.g., Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276, 1304 (S.D. Fla. 2018) (INA prohibits local officers from holding based on a detainer); *Davila v. N. Reg'l Joint Police Bd.*, 370 F. Supp. 3d 498, 551 (W.D. Pa. 2019) (same) *with City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 187-88 (5th Cir. 2018) (rejecting facial preemption challenge to state detainer statute). In this case however, it is simply not at issue.

beyond the completion of their [] criminal process.").[10]  This Court should reject the improper invitation to weigh in on questions that are not presented by this case.

The only question before the Court, should it reach this claim, is whether the lack of state law authority for a detainer arrest renders the arrest unconstitutional.  If the Court reaches that claim, it should affirm that a detainer arrest by a state or local officer who lacks state law authority for the arrest violates the Fourth Amendment.

## II.    THE DISTRICT COURT CORRECTLY ENJOINED THE ISSUANCE OF DATABASE DETAINERS.

The district court properly granted injunctive relief to protect named Plaintiffs and class members from ongoing and imminent unconstitutional arrests on detainers.

### A.    Plaintiff Gonzalez Has Standing.

ICE argues Plaintiff Gonzalez lacks standing to seek injunctive relief.  Gov. Br. 20-23.  But ICE does not appear to contest that Mr. Gonzalez had standing when he first sued.  Instead, it argues that because the complaint was subsequently amended after Mr. Gonzalez was released from custody, he now lacks standing to seek relief on behalf of the class.  That is flat wrong.

Plaintiff Gonzalez's standing at the time he filed suit in June 2013 was clear. He was in the pretrial custody of the Los Angeles Sheriff's Department and subject

---

[10] To the extent ICE argues otherwise here, its concession below has waived the issue.  *See Miller v. City of Los Angeles*, 661 F.3d 1024, 1029 (9th Cir. 2011) (holding that "concession [of violation of court order at trial] amounts to a waiver so that we must deem a violation established for purposes of this appeal").

to an immigration detainer, which prevented him from posting bail. SER 853; ER 14 ¶2, 501-502. "Remaining confined in jail" because an immigration detainer prevents one's release on bail "is an Article III injury" which supports standing. *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014); *see also Hernandez v. United States*, 939 F.3d 191, 207-08 (2d Cir. 2019). Moreover, Gonzalez faced further injury: additional days in custody once he was ordered released, as requested by the detainer. ER 14, 189; SER 853. It is well-settled that a plaintiff "need not wait" until a threatened injury occurs to sue. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002).[11]

Standing is assessed based on the facts as they existed "as of the *commencement* of suit." *Lujan*, 504 U.S. at 570 n. 5 (emphasis added); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("when the suit was filed"); *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) (same). And, contrary to ICE's suggestion, subsequent amendment does not reset the clock for purposes of the named plaintiffs' standing. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff

---

[11] Mr. Gonzalez's subsequent release did not moot his ability to represent the class. As the district court correctly held, "the transitory exception applies to the Gonzalez Plaintiffs' claims" and so Mr. Gonzalez—who had a live claim at the beginning of the litigation—had standing to seek relief on behalf of the transitory claims of the class. ER 170-71 (citing *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997)). ICE does not contest that mootness holding.

is assessed at the time of the original complaint, even if the complaint is later amended."); *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013) (same); *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (same).[12]

ICE's reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and its progeny is similarly misplaced. Gov. Br. 21-23.[13] *Lyons* applies where the injury occurred in the past, requiring the plaintiff to show a likelihood the injury will be repeated. *Lyons*, 461 U.S. at 108. Here, as explained, Mr. Gonzalez's injury was ongoing when he filed suit; he did not need to show he would *again* be subject to a second detainer in the future in order to seek rescission of the detainer that was already injuring him. In *Cty. of Riverside v. McLaughlin*, for example, the Court rejected the application of *Lyons* where plaintiffs were in custody at the time their complaint was filed; because their harms were ongoing, they were not required to "show that they are likely to be subjected again to the unconstitutional conduct." 500 U.S. 44, 51 (1991); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184, 188 (2000) (similar); *Haro v. Sebelius*, 747 F.3d 1099, 1109 (9th Cir. 2014) (same); *cf. Davidson v. Kimberly-Clark Corp.*, 889 F.3d

---

[12] The standing of a plaintiff added to the case after it begins is assessed at the time of the amended complaint that adds him or her. *See Lynch*, 382 F.3d at 647. Thus, Plaintiff Chinivizyan's standing is assessed at the time of the Second Amended Complaint, which brought him into the action.

[13] *Rockwell Int'l Corp v. United States*, 549 U.S. 457, 473-74 (2007), on which ICE relies, says nothing at all about standing.

956, 971 n.7 (9th Cir. 2018) (explaining that the "threat of a similar injury recurring" is unnecessary where a plaintiff faces a "prospective injury").

**B.    The District Court's Prior Standing Decision Does Not Bar the Relief it Ordered.**

ICE argues that the district court should not have enjoined ICE from issuing detainers to class members, under the law-of-the-case doctrine, because the court did not expressly "revise" or "reconsider" its prior conclusion that Plaintiff Gonzalez lacked standing for prospective injunctive relief.  Gov. Br. 23-25. That is wrong for at least three reasons.

First, the 2019 injunction is perfectly consistent with the court's prior order on standing.  ICE confuses standing with the scope of injunctive relief.  The district court in 2014 addressed Gonzalez's *individual* standing, not the range of remedies that would be available to protect a certified class from the same injury. ER 192-97. The court held in 2014, and ICE does not contest, that Gonzalez had standing for injunctive relief, specifically to seek rescission of his detainer.  ER 194.  It is therefore uncontested that the class Gonzalez represents—which includes those who will be issued detainers in the future—can seek rescission of their detainers as well. Once the district court concluded that future class members were entitled to rescission of their detainers, it was well within its discretion to tailor the injunction to prevent ICE from issuing those detainers in the first place.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (explaining that the "essence of equity

34

jurisdiction" is the district court's discretion to "mould each decree to the necessities of the particular case"); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (noting the "broad" and "flexib[le]" scope of district courts' "equitable powers"). The district court was under no obligation to let ICE issue unconstitutional detainers only to immediately rescind them.

Second, ICE's argument fails on its own terms. The law-of-the-case doctrine "does not impinge upon a district court's power to reconsider its own interlocutory order provided that the district court has not be divested of jurisdiction over the order." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001). Indeed, "all rulings of a trial court are subject to revision at any time before the entry of judgment." *United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986) (internal quotations omitted); *see* Fed. R. Civ. P. 54(b) (same). ICE cites no authority for its novel contention that, if the district court revised its prior standing analysis, it was required to *explicitly* state that it was doing so. Nor is there any question the district court considered this standing issue. After ICE belatedly raised the issue two months after the court's opinion, the court received briefing and argument on this issue before issuing its final judgment. SER 37-47, 15-35, 1296-97, 13.[14]

---

[14] ICE faults the district court for not "engaging" with the prior standing decision in its earlier opinion, Gov. Br. 25, but ICE did not raise this issue at summary judgment in 2017, before or at trial in 2019, in its post-trial brief, or in a motion for

Third, in any event, "the doctrine of 'law of the case' does not apply to the fundamental question of subject matter jurisdiction." *Green v. Dep't of Commerce*, 618 F.2d 836, 839 n.9 (D.C. Cir. 1980). District courts may reconsider a plaintiff's standing at any stage of litigation. *See Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *overruled on other grounds*, *Johnson v. California*, 543 U.S. 499 (2005). This is because "the concerns implicated by the issue of standing—the separation of powers and the limitation of this Court's power to hearing cases or controversies under Article III of the Constitution—trump the prudential goals of preserving judicial economy and finality" that underlie the law-of-the-case doctrine. *Pub. Interest Research Grp. Of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 118 (3d Cir. 1997). As explained above, Gonzalez plainly did have standing to seek an injunction, as he was subject to ongoing harm and facing imminent detention based on his detainer.

In sum, the district court's orders were consistent; but even if the court had revised its standing conclusions, it was fully entitled to do so.

## C. Plaintiff Gonzalez Properly Sued to Enjoin an Actual and Imminent Seizure.

ICE argues the injunction should be vacated because Gonzalez was never actually seized. Gov. Br. 25-28. That is wrong.

---

reconsideration. ICE raised this issue for the first time in a notice filed two months *after* the opinion. SER 37-47.

ICE concedes that a Fourth Amendment seizure occurs when a person is detained on an immigration detainer. Gov. Br. 26; *see Morales*, 793 F.3d at 211 ("[T]he law was clearly established in 2009 that, under the Fourth Amendment, an ICE agent required probable cause to issue an immigration detainer."); *Hernandez*, 939 F.3d at 200 (noting government concession). That concession resolves ICE's seizure argument. It is axiomatic that an injunction may issue to protect a plaintiff from ongoing and imminent harm—here, Plaintiff Gonzalez's ongoing inability to post bail because of the detainer, and his imminent imprisonment on a detainer. *See, e.g., Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004).[15] A court need not wait until an illegal seizure occurs before enjoining it. *See, e.g., Melendres*, 695 F.3d at 997-99, 1001 (affirming injunction prohibiting imminent arrests in violation of the Fourth Amendment).

ICE's contrary arguments are misplaced. *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989), on which ICE relies, Gov. Br. 25-28, holds only that an "accidental" restraint of movement caused by government action does not constitute a seizure. It says nothing about injunctions of purposeful, imminent arrests. And the fact that

---

[15] Plaintiff Chinivizyan represents the Judicial Determination Class, not the Probable Cause Subclass. At the time he entered the case, he, too, was being detained solely based on an ICE detainer, after a court had ordered him released to a residential drug treatment facility. ER 52, 55, 858-60. ICE argues that the detainer form disclaims any effect on "custody classification, work, quarter assignments or other matters." Gov. Br. 28. But this language does not address court-ordered releases like Chinivizyan's, and the form specifically requests detention in that circumstance.

37

detainers request, rather than compel, detention, is similarly immaterial. Gov. Br. 25-26. ICE is responsible for arrests made at its behest—even though it lacks the power to *compel* such arrests. SER 854; *see Morales*, 793 F.3d at 217-18 (ICE agent responsible for arrest requested by detainer); *Mendia*, 768 F.3d at 1012-13 (9th Cir. 2014) (ICE responsible for plaintiff's inability to post bond because of detainer); *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012) ("an official with no official authority over another actor can also be liable for that actor's conduct if he induces that actor to violate a third party's constitutional rights[.]").

**D.    Class Certification Was Proper.**

1. <u>Commonality</u>. ICE argues that because probable cause is usually an individualized question, the district court erred in finding commonality. Gov. Br. 32-33. But commonality requires only that Plaintiffs identify "a common contention . . . of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, members of the Probable Cause Subclass are all challenging the same practice (ICE's issuance of database-only detainers) and are asserting the same legal claim (those databases are too unreliable to support probable cause). ER 169. They seek the same relief against the same practice for the same reason. That common challenge is the "glue" holding class members' claims together. *Id.* at 352.

38

Indeed, courts regularly certify classes challenging arrests where, as here, class members identify a common policy or practice that renders all the arrests unlawful for the same reason. *See, e.g. Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (finding commonality where plaintiffs challenge policy "which leads officers to detain individuals without reasonable suspicion"); *cf. LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986) (affirming certification of class of migrant farm workers challenging home searches conducted pursuant to "a uniform pattern of INS conduct").[16]

Importantly, all Probable Cause Subclass members were issued detainers "*solely* on the basis of electronic database checks." ER 6 n.1 (emphasis added). That fact answers ICE's assertion that "the database search is but one part of the totality-of-the circumstances analysis," which in theory could include other information beyond the databases. Gov. Br. 35. For the subclass, the database search *is* the totality of the circumstances, because the subclass is defined to exclude anyone for whom ICE considered additional information.

---

[16] The cases on which ICE relies, Gov. Br. 35, are not to the contrary. *Portis v. Chicago* recognized that class treatment is appropriate where the class challenges a policy. 613 F.3d 702, 705-06 (7th Cir. 2010). And *Florida v. Harris* did not involve questions of commonality but rather the question how the reliability of evidence should be evaluated. 568 U.S. at 244-45.

2. <u>Typicality</u>.  ICE's typicality objections are without merit.

First, ICE claims that "what constitutes probable cause" of removability "will differ" between non-citizens and U.S. citizens like Gonzalez.  Gov. Br. 36.  That misunderstands the requirement of probable cause.  In all cases, to issue a detainer, ICE must have sufficient evidence that a person is (1) a non-citizen and (2) removable.  ER 20 ¶¶42-43; *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). This standard is exactly the same for all class members, regardless of which ones ultimately turn out to be citizens or otherwise not removable.  *See Henry v. United States*, 361 U.S. 98, 102 (1959) (probable cause turns on the information known to law enforcement at the time of arrest, not on the person's ultimate guilt or innocence); *Florida v. Harris*, 568 U.S. 237, 249 (2013) (same).  And for Gonzalez, ICE assessed probable cause of removability based on the exact same flawed databases as every other class member.  ER 14 ¶¶3-5.  His Fourth Amendment claim is thus identical to all other class members' claims.

Second, ICE claims that Gonzalez, who was born in the United States, is not typical of other class members, because "evidence of foreign birth" categorically creates probable cause of removability for other class members.  Gov. Br. 36.[17]  In

---

[17] ICE also claims that Gonzalez's circumstances were atypical because of an erroneous notation on his LAPD booking record, Gov. Br. 39, but ICE stipulated at trial that it issued Gonzalez's detainer in reliance solely on database information that incorrectly reported his place of birth as Mexico.  ER 60 ¶¶4-9.

effect, ICE argues it could arrest the 20 million foreign-born U.S. citizens and millions of others with lawful status at any point, based solely on their birthplace. SER 93:5-18, 459 ¶¶1, 3, 4, 911, 933-35, 937. That staggering claim is both waived and wrong. ICE conceded below that foreign birth alone does not create probable cause. *See* ER 127-28 ("ICE admits that evidence of foreign birth and no match in a federal immigration database is not probable cause of removability."). And courts have made clear that foreign birth alone "is insufficient to warrant a prudent person to believe that [a person is] in this country illegally." *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 39 (D.R.I. 2014), *aff'd in part, dismissed in part*, 793 F.3d 208 (1st Cir. 2015); *see United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (rejecting stops based on "broad profiles which case suspicion on entire categories of people"); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 890 (N.D. Cal. 2016) (holding that the use of "national origin as the only reason[] to deprive Plaintiff of his liberty [through a detainer] violates his constitutional rights"). The only case the government cites, *Scales v. INS*, addressed the burden-shifting procedures that are used in removal proceedings, not probable cause to arrest. 232 F.3d. 1159, 1163 (9th Cir. 2000).

Third, ICE argues that because Gonzalez was not held on a detainer "at the time of the operative complaint" his claims are atypical. Gov. Br. 39. But ICE does not contest that the class Gonzalez represents is "inherently transitory" because

41

detainers do not last long enough for class representatives to litigate their claims to judgment. Gov. Br. 38-39. For such a class, typicality, like standing, is assessed at the time of the *original* complaint, when Gonzalez's claims were plainly typical of the class. *See, e.g.*, *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091-92 (9th Cir. 2011) (representative of transitory class can still represent the class after he is no longer subject to the challenged practice); *Doe v. Wolf*, 424 F.Supp.3d 1028, 1043 (S.D. Cal. 2020) (deciding "typicality" and "adequacy" as of the filing of the [original] complaint."); *Lyon v. United States Immigration & Customs Enf't*, 300 F.R.D. 628, 637 (N.D. Cal. 2014) (holding that class representative's removal did not defeat his adequacy where class claims were inherently transitory).

Finally, ICE maintains that non-citizen class members are barred by 8 U.S.C. § 1252(b)(9) from challenging their detainer arrests. Gov. Br. 40-43. That is wrong.

This Court has long "held that § 1252(b)(9) does not preclude" claims that "challenge detention," like the Plaintiffs' challenges to their arrests. *Flores-Torres v. Mukasey*, 548 F.3d 708, 712 n.6 (9th Cir. 2008). As § 1252(b)(9)'s legislative history explains, it does not bar "challenges to detention that are independent of challenges to removal orders." *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) (quoting H.R. Rep. No. 109-72, at 75 (2005)) (cited in Gov. Br. 42). The Supreme Court and numerous circuits have accordingly held § 1252(b)(9) inapplicable to a variety of detention-related claims. *See, e.g.*, *Nielsen v. Preap*, 139 S. Ct. 954, 962

42

(2019) (plurality); *Jennings v. Rodriguez*, 138 S. Ct. 830, 839-41 (2018) (plurality);

*accord id.* at 876 (Breyer, J., dissenting); *E.O.H.C. v. DHS*, 950 F.3d 177, 185 (3d

Cir. 2020) ("§ 1252(b)(9) does not bar challenges to detention rather than removal");

*Hamdi ex rel. Hamdi v. Napolitano*, 620 F.3d 615, 627 (6th Cir. 2010); *Nadarajah*

*v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006).

Section 1252(b)(9) cannot bar the Plaintiffs' arrest claims because that would

make them "effectively unreviewable." *Jennings*, 138 S. Ct. at 840 (rejecting the

application of § 1252(b)(9) on this basis). Where § 1252(b)(9) applies, the claims it

channels may only be raised in a petition for review of a final removal order. But

by the time there is a final removal order, "the allegedly [unlawful detainer arrest]

would have already taken place," so it would be too late to seek an injunction against

the arrest. *Id.* And "no such [removal] order would ever be entered" for most people

subject to detainers, *id.*, precluding any petition for review challenge, because ICE

does not even pick up 80% of them, *see supra* Facts, Part I.C, and others will defeat

their removal charges in immigration court. Section 1252(b)(9) does not preclude

"now-or-never claims" like these. *E.O.H.C.*, 950 F.3d at 185.

For those who do eventually receive a final removal order, "[c]ramming

judicial review" of the arrest "into the review of the final removal order" would make

no sense. *Jennings*, 138 S. Ct. at 840. A petition for review is a vehicle to challenge

"a final order of removal," 8 U.S.C. § 1252(a)(1), not an already-completed arrest

independent of the validity of the removal order. Faced with a freestanding challenge to an arrest, it is not clear what the court of appeals could do. A limited remedy—suppression of evidence—is only potentially available when an arrest is an "egregious" Fourth Amendment violation *and* produces evidence that is material to removal. *Armas-Barranzuela v. Holder*, 566 Fed. App'x 603 (9th Cir. 2014); *see* Gov. Br. 43 (citing suppression cases only). Because of this higher standard, courts reviewing suppression claims often "need not and do not decide whether the seizure violated Petitioners' Fourth Amendment rights." *Martinez-Medina*, 673 F.3d at 1034. And at the point of arrest, it is impossible to know whether the arrest will produce evidence that is subject to suppression. The abstract possibility of suppression, for a small subset of illegal arrests, cannot mean that all arrests are immune from review ex ante.

ICE quotes the *Jennings* plurality out of context to suggest that challenges to "the decision to detain [a person] in the first place" are barred by § 1252(b)(9). Gov. Br. 41. *Jennings* did not say that. The plurality left such challenges to the side, observing that they were not at issue, and expressly disclaimed any "attempt to provide a comprehensive interpretation" of § 1252(b)(9), because "[t]he parties ha[d] not addressed [its] scope." *Jennings*, 138 S. Ct. at 841. Moreover, all of the plurality's reasons why a claim would fall outside § 1252(b)(9)—including denial

44

of meaningful review and poor fit with petitions for review—apply equally to claims challenging detainer arrests.

ICE does not grapple with the startling implications of its argument, which would mean that non-citizens could never challenge imminent unconstitutional arrests, even if the violation is clear and the arrest is certain to occur, and the vast majority could never challenge them even after the arrest. ICE would be free to violate any Fourth Amendment rule—making arrests without probable cause, or home arrests without a warrant. A few could eventually seek suppression only, and all others would be left with no remedy of any kind. Congress did not immunize that kind of lawless enforcement activity.

### E.    The Injunction is Proper.

ICE argues that, even if the plaintiffs have standing, satisfy Rule 23, and win on the merits, the Court should *still* vacate or "narrow" the injunctions. Gov. Br. 46-50.

1. ICE maintains that its general interest in using detainers for "law enforcement" outweighs the plaintiffs' interests, such that no injunction should issue even if the detainers issued by PERC violate the Fourth Amendment. Gov. Br. 46-48. But "it is *always* in the public interest to prevent the violation of a party's constitutional rights" and to prevent "unlawful detention." *Melendres*, 695 F.3d at 1002 (emphasis added) (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d

959, 974 (9th Cir. 2002)). Nor can ICE "reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.3d 719, 727 (9th Cir. 1983). Having concluded that these arrests violate the Constitution—and impose the irreparable harms of pretrial detention—the district court did not abuse its discretion by enjoining them. ER 47-48 ¶¶28-33. *See N.S. v. Hughes*, No. 1:20-cv-101-RCL, 2020 WL 2219441, at \*11 (D.D.C. May 7, 2020) (rejecting, in an ICE detainer case, the government's "attempt to minimize" the "serious infringement on one's personal freedoms" from "being shackled and detained").

Moreover, as the district court recognized, the injunction "leaves numerous feasible avenues for ICE to investigate and effectively enforce immigration law." ER 47 ¶31. It can issue detention requests that comply with the requirements of the Fourth Amendment. It can interview non-citizens while they are in criminal custody, or review their A-Files, which are now available electronically and through expedited mail. ER 35 ¶¶137-38. It can investigate and arrest non-citizens on its own. And it can use detainers to ask prisons and jails for advance notice of people's release dates, as it did for many decades prior to its current regime. *See supra* Facts Part I.B. Indeed, ICE has done precisely that since the injunction, informing its staff that the injunction did "not impact ICE's ability to request advance notice of release from state and local LEAs." SER 833. What it cannot do, however, is deprive

people of their liberty, with no outside review, based on an unreliable patchwork of inaccurate databases.

2.  ICE contends that injunctive relief in this case is barred by 8 U.S.C. § 1252(f)(1).[18]  Gov. Br. 48-49.  That is wrong for two reasons.

First, none of the claims in this case "seek to enjoin the operation" of any immigration statutes; rather, the district court enjoined actions that are "not authorized by the statutes." *Rodriguez v. Hayes*, 591 F.3d 1105, 1120-21 (9th Cir. 2010).  Thus, for example, the district court enjoined the issuance of detainers, based on database searches, that were not supported by probable cause.  Far from directing the issuance of unfounded detainers, the immigration arrest statute in fact *requires* probable cause.  *See Morales*, 793 F.3d at 216.  Where a plaintiff seeks only to "enjoin conduct alleged not to be authorized by the proper operation" of the statutes, "[s]ection 1252(f) does not bar injunctive relief." *Rodriguez*, 591 F.3d at 1120.

Second, the only statute that even mentions detainers, 8 U.S.C. § 1357(d), falls outside the scope of § 1252(f)(1), which ICE concedes is limited to "Part IV," 8 U.S.C. §§ 1221-1232.  Gov. Br. 48.  ICE claims that the power to issue detainers is "codified in" 8 U.S.C. §§ 1226 and 1231, *id.* 49, but neither statute mentions detainers or anything similar.  ICE can point only to a regulation citing § 1226 (but

---

[18] ICE correctly does not argue that § 1252(f)(1) casts any doubt on the district court's grant of declaratory relief. *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010).

not § 1231) as general authority—rather than any statute in Part IV directing or specifically empowering ICE to take the actions challenged in this case. *Id.* (citing 8 C.F.R. § 287.7). Its argument instead appears to be that the injunction may interfere with how ICE *chooses* to exercise the statutory power to arrest and detain under §§ 1226 and 1231. This Court, however, has already rejected such reasoning. *See Rodriguez*, 591 F.3d at 1121 (explaining that the en banc Court had rejected an argument based on such "interfer[ence]" with Part IV and upheld an injunction because it was "issued under part V of the subchapter, rather than part IV and, therefore, not within the terms of Section 1252(f)") (citing *Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc)).

ICE's sweeping view of § 1252(f)(1) is unprecedented. In its telling, any injunction bearing on ICE's investigations and apprehensions, including collaboration from other government agencies, falls within that statute. But Congress specifically chose to limit the reach of § 1252(f)(1) to §§ 1221-1231, "which are provisions relating to the [system of] 'removal' proceedings" established in 1996. *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1121 (9th Cir. 2001). And this case bears no resemblance to the challenges to statutes governing removal proceedings on which ICE relies. *Hamama v. Adducci*, for example, addressed challenges to "removal and detention provisions" in Part IV, not challenges to investigation and arrest issues that only vaguely touch those statutes. 912 F.3d 869,

880 (6th Cir. 2018). And *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1140 (9th Cir. 2020), likewise involved a detention statute in Part IV, 8 U.S.C. § 1225(b)(1)(B)(ii). ICE emphasizes that *Padilla* distinguished the injunction at issue there—which it upheld—from a hypothetical case brought by noncitizens "not yet facing proceedings." Gov. Br. 48. But the Court's reference was to a challenge *to the statutes in Part IV* by such persons—not any and every challenge to enforcement actions brought before removal proceedings. Nothing in § 1252(f)(1) provides the kind of "unmistakable legislative command" that would be required to restrict the court's "traditional equitable powers" in such a dramatic way. *Rodriguez*, 591 F.3d at 1120.

3. Finally, ICE asserts a supposed Article III objection that largely rehashes its previous arguments. Gov. Br. 49-50 (briefly restating objections to the district court's evidentiary analysis, and suggesting that some class members lack prospective standing, were not seized, or were seized based on probable cause). There is no Article III problem with the injunction, which simply bars ICE from issuing detainers that violate the Fourth Amendment against the Probable Cause Subclass. The injunction does not extend beyond the certified class, and each detainer to which it applies violates the Fourth Amendment. The injunction thus goes exactly as far as "was necessary to provide relief" to the class. *Lewis v. Casey*, 518 U.S. 343, 360 (1996).

49

### III. *CROSS-APPEAL*: ICE DETAINERS VIOLATE THE REQUIREMENT THAT A NEUTRAL OFFICIAL PROMPTLY DETERMINE PROBABLE CAUSE.

ICE's detainer arrests violate another central tenet of the Fourth Amendment: Probable cause for an arrest must promptly be reviewed by an independent, neutral official who is not engaged in law enforcement activities. *See Gerstein*, 420 at114-15 . Neutral review, whether before or after an arrest, is an essential check against arbitrary arrest and pretrial detention. It has long been required for civil and criminal arrests of all kinds, including immigration arrests dating back to the framing of the Fourth Amendment. Yet under its present detainer scheme, ICE has jettisoned neutral review altogether, issuing detainers with no outside review at all—resulting in detention which may last for weeks, months, or years. The result is that ICE has subjected thousands of U.S. citizens and others who are not removable to arrest and pretrial detention. The Court should reverse the district court's grant of partial summary judgment to Defendants on the Judicial Determination Class's challenge to ICE's failure to provide neutral review for detainer arrests and hold that ICE's detainer arrests without any neutral review violate the Fourth Amendment.

### A. Detainer Arrests Violate the Requirements of *Gerstein*.

Under the Fourth Amendment, probable cause for an arrest must be determined by a "neutral and detached" official, "someone independent of police and prosecution." *Gerstein*, 420 U.S. at 112-14, 117-18. This "essential" guarantee

50

lies at "the very heart of the Fourth Amendment." *Id.* at 113 n.12, 114 (quotation marks omitted). As the Supreme Court has emphasized, probable cause cannot be left to the sole judgment of arresting officers, who are "engaged in the often competitive enterprise of ferreting out crime." *Id.* at 113 (quotation marks omitted). Unreviewed arrests carry a high risk of error and impose serious consequences, because the resulting pretrial detention "may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Id.* at 114. Prompt, neutral review is therefore critical: "When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty." *Id.* This basic requirement applies to all kinds of arrests—criminal as well as civil, including immigration arrests. *See infra* Part IV.B.

Neutral review is not a cumbersome process. It can occur either before the arrest (in the form of a warrant) or "promptly after arrest." *Gerstein*, 420 U.S. at 125. To be sufficiently prompt, post-arrest review must generally happen within 48 hours of arrest, though the timing can account for "practical realities" on the ground. *Cty. of Riverside*, 500 U.S. at 56-57. Review can be "informal" and proceed "without an adversary hearing." *Gerstein*, 420 U.S. at 120.

Importantly, this review need not be performed by an Article III judge. The critical requirement is simply that the reviewer be "independent of police and

prosecution," so that arrests are not left to the unilateral discretion of enforcement officers. *Gerstein*, 420 U.S. at 118. Review may therefore be performed by a sufficiently detached and neutral administrative officer. *See, e.g.*, *Shadwick v. City of Tampa*, 407 U.S. 235, 350 (1972) (municipal court clerk). Detainer arrests could, for instance, be reviewed by immigration judges—administrative officials within the Department of Justice who adjudicate removal cases, and who are not involved in law enforcement activities. *See* 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1240.1(a). Indeed, ICE's predecessor agency, the Immigration and Naturalization Service, for years assigned probable cause review to immigration judges, who were previously known as "special inquiry officers." *See Arias v. Rogers*, 676 F.2d 1139, 1142 (7th Cir. 1982) (arrests reviewed by "a special inquiry officer, also called an immigration judge"); *Flores v. Meese*, 942 F.2d 1352, 1358, 1364 (9th Cir. 1991) (affirming 1988 injunction requiring immigration judges to "determine probable cause for [an INS] arrest"), *rev'd on other grounds*, *Reno v. Flores*, 507 U.S. 292 (1993).

ICE's current detainer regime, however, dispenses with neutral review altogether. ICE officers issue detainers entirely on their own, with no review at any point by any independent official. *See* 8 C.F.R. § 287.7(b) (detainers can be issued by *any* "[i]mmigration enforcement agent[]"). The same is true for ICE's accompanying administrative "warrants," which may be issued by "[i]mmigration enforcement agents" and other types of enforcement officers, 8 C.F.R. §

287.5(e)(2)(i)-(lii), none of whom are remotely "independent of police and prosecution." *Gerstein*, 420 U.S. at 118; *see Hughes*, 2020 WL 2219441, at *6 (noting this "lack of neutrality"). As the Supreme Court has held repeatedly, such officers within the investigating or prosecuting office are not independent or neutral, and cannot be the ones to review probable cause. *See, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971) (senior enforcement official was not detached or neutral); *Mancusi v. DeForte*, 392 U.S. 364, 371-72 (1968) (same). The district court missed this key neutrality point entirely. It concluded that probable cause could be reviewed by "executive officer[s]," SER 802—which plaintiffs have never disputed—but did not even consider whether ICE's own officers were neutral (they are not), or whether ICE could exempt itself from neutral review (it cannot, *see infra* Part IV.B).[19]

Nor does ICE take any steps, once the individual is transferred to its custody, to cure this total lack of neutral review. To the contrary, ICE never submits its arrests for neutral review of probable cause. *See* SER 808 ¶¶8-9. Once in ICE custody,

---

[19] The district court also suggested that "the Legislature has determined that removal pursuant to ICE officers' probable cause determinations and examinations by ICE officers is sufficient." SER 803. Of course, a statute cannot override the Fourth Amendment. But even the premise is wrong, because the immigration arrest statutes do not purport to allow arrests without neutral review. They simply authorize arrests generally without specifying which official reviews probable cause. *See* 8 U.S.C. § 1226(a) (arrest warrants issued by "the Attorney General"); *id.* § 1357(a)(2) (warrantless arrests reviewed by an official "with authority to examine aliens").

arrestees are "examin[ed]" by literally any ICE "officer," including "the arresting officer" *himself*. 8 C.F.R. § 287.3(a); SER 808 ¶9. And having been arrested without any neutral oversight, "[a] person who is detained on an immigration detainer generally does not see an immigration judge" for any purpose "for *weeks* after his arrest on the detainer." *See* SER 808 ¶13 (emphasis added); 814 ¶¶4-5 (describing delays of a month or more).

ICE's detainer scheme, in particular, is uniquely framed to flout the Fourth Amendment by foreclosing even the theoretical possibility of a prompt hearing before a neutral official. *See Cty. of Riverside*, 500 U.S. at 58 (scheme involving "regular practice" of three to four days' delay violated the Fourth Amendment). Detainers currently seek 48 hours of extra detention by a criminal law enforcement agency, and until this case was filed, they regularly sought four days or more. ER 64 ¶31; 8 C.F.R. § 287.7(d) (describing detainer holds for "48 hours, *excluding* [weekends] and holidays") (emphasis added). During this period of initial detention, the subject is still in the custody of the (generally non-federal) criminal enforcement agency and cannot even *attempt* to request any hearing before a neutral official, let alone a probable cause hearing. ICE's detainer system thus allows the entire 48-hour period identified by *Cty. of Riverside* to pass before a person could even theoretically *request* a hearing before an immigration judge.

Without any requirement that ICE justify its detainer arrests to a neutral party, ICE predictably issues detainers at a furious pace and errs on the side of arrest, resulting in widespread errors. ICE agents sitting in a federal building in Laguna Niguel issue detainers across the country at the click of a button, without interviewing suspects, based on outdated, incomplete, and error-filled databases. *See supra* Facts Part I.D. Prior to this lawsuit, agents issued hundreds of thousands of detainers based merely on the "initiation of an investigation," ER 56—a standard that falls far short of probable cause. *See Dunaway*, 442 U.S. at 214-16. Since then, despite changing the detainer form to remove the "investigation" check box, ICE concedes that its standards for issuing detainers have not changed, even though its policy now requires probable cause. *See* ER 58 ¶11. And after so easily instigating these arrests, ICE does not even pick up most of the people for whom it issues detainers, *see supra* Facts Part I.C; they spend 48 extra hours in jail for no reason. As a result of these practices, ICE has targeted thousands of U.S. citizens and others who cannot be removed, forcing many of them to endure weeks and months of detention without any independent review of probable cause. ER 33-34 ¶¶128-32.[20]

---

[20] In recent years, these mistakes have led to a constant stream of lawsuits by U.S. citizens, like the plaintiffs in this case, whom ICE has targeted with detainers. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (U.S. citizen *twice* subject to ICE detainer); *Hernandez*, 939 F.3d at 202; *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014); *Ortega v. ICE*, 737 F.3d 435, 437 (6th Cir. 2013); *Creedle*, 349 F. Supp. 3d at 1289 ("U.S. citizens are frequently held pursuant to detainers."); *Brown v. Ramsay,* No. 4:18-cv-10279, Summary Judgment Motion, ECF No. 126 (S.D. Fla.

These careless arrests illustrate why prompt, neutral review is an "essential" protection against "unfounded interference with liberty." *Gerstein*, 420 U.S. at 114.

## B. The *Gerstein* Rules Apply to All Arrests, Including Detainer Arrests.

ICE may argue that it can abandon neutral review altogether when issuing detainers. There is no basis for that radical break from normal Fourth Amendment principles.

1. Neutral determination of probable cause is required by the Fourth Amendment for *all* arrests—including immigration detainer arrests. Such review is "essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty." *Gerstein*, 420 U.S. at 114. *Gerstein* accordingly stated its rule categorically: Neutral review is required for "*any* significant pretrial restraint of liberty." *Id.* at 125 (emphasis added).

This basic requirement applies to civil arrests just as it applies to criminal arrests. In *Schall v. Martin*, the Supreme Court applied *Gerstein* to a scheme of civil arrests for juvenile offenses. 467 U.S. at 257 n.4 (arrests were "civil rather than

---

filed 2018) (U.S. citizen targeted twice); *Uroza v. Salt Lake Cty.*, 2014 WL 4457300, *5 (D. Utah Sept. 10, 2014) ("Between 2008 and 2012, ICE issued detainers against more than 800 U.S. citizens and 28,000 legal permanent residents."); *Mayorov v. United States*, 84 F. Supp. 3d 678 (N.D. Ill. 2015); *Makowski v. United States*, 27 F. Supp. 3d 901 (N.D. Ill. 2014); *Davila v. United States*, 247 F. Supp. 3d 650 (W.D. Pa. 2017); *Vazquez-Mentado v. Buitron*, 2013 WL 2318636 (N.D.N.Y. May 28, 2013).

criminal").[21]   Under that scheme, before juveniles could be subject to "pretrial detention," they were entitled to a "probable-cause hearing" before a neutral decisionmaker.   *Id*. at 274-77.   The Court held that the "same concern" with "ensuring adequate predetention procedures" discussed in *Gerstein* applied in this civil context, and that the neutral review process at issue satisfied *Gerstein*.   *Id.* at 275.

Likewise, neutral review is required for all kinds of civil arrests, whenever a person is facing significant detention.   *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 606 (1979) (civil involuntary commitment requires initial review "by a neutral factfinder") (quotation marks omitted); *State v. Klinker*, 85 Wash.2d 509, 514-19 (1975) (applying *Gerstein* to civil arrests for child support delinquency); *see also Stone v. Holzberger*, 23 F.3d 408, *3 (6th Cir. 1994) (unpublished) (applying *Gerstein* to material witness arrests); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 322-23 (1978) (civil administrative searches require review by a "neutral officer").   The requirement of neutral review is reflected in a wide variety of state statutes that

---

[21] While *Schall* involved a due process claim, the Court relied on *Gerstein* and explained that both due process and the Fourth Amendment reflect "the same concern[s]" in the arrest and pretrial detention context.   467 U.S. at 275; *cf. Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 n.5 (9th Cir. 2019) (recognizing "overlap" between "the substantive due process inquiry" and "a Fourth Amendment analysis").

provide for civil arrests.[22]  These laws typically require neutral review before any civil arrest, except in emergencies, when they require neutral review soon after.  *See supra* n.22.

The ubiquity of neutral review reflects that a person's liberty is curtailed by a civil arrest no less than by a criminal arrest.  Civil pretrial detention imposes the exact same "serious" consequences as criminal pretrial detention.  *Gerstein*, 420 U.S. at 114; *see Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) (describing the "devastatingly adverse" consequences of civil detention).  And the danger of unilateral police action is just as great in civil contexts.  *See Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 532 (1967) (neutral review in civil context ensures that people are not "subject to the discretion of the official in the field"); *Marshall*, 436 U.S. at 322-23 (neutral review needed so that "administrative officers" do not have "unbridled discretion").  The civil nature of an arrest is thus no reason to exempt it from a neutral determination of probable cause.

ICE detainer arrests are no exception.  Fourth Amendment principles apply equally in the immigration context.  Brief immigration stops must be based on

---

[22] *See, e.g.*, Mass. Gen. L. ch. 123 § 12 (mental illness protective custody); *id.* § 35 (substance abuse); *id.* ch. 215 § 34A (child support); Mont. Code Ann. § 53-21-122 (civil commitment); *id.* § 53-21-129 (psychiatric emergency); *id.* § 25-14-102 (arrest to enforce civil judgments); Cal. Welf. & Inst. Code § 5206 (psychiatric emergency); Ala. Code § 22-52-7(a) (same); W. Va. Code Ann. § 27-5-2(c) (addiction and danger to self); *id.* § 27-5-1 (involuntary commitment); Va. Code Ann. § 37.2-808 (psychiatric emergency).

reasonable suspicion, just like criminal stops. *United States v. Brignoni-Ponce*, 422 U.S. 873, 880-81 (1975) (applying *Terry v. Ohio*, 392 U.S. 1 (1968)). Immigration arrests must be based on probable cause. *Id.* at 882; *see Tejeda-Mata*, 626 F.3d at 725. The Supreme Court and this Court have consistently applied normal Fourth Amendment rules to immigration searches and seizures, often relying exclusively on criminal cases. *See, e.g.*, *United States v. Ortiz*, 422 U.S. 891, 896-97 (1975) (traffic checkpoint searches); *Almeida-Sanchez v. United States*, 413 U.S. 266, 269-70 (1973) (roving patrol searches); *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008) (home arrests); *Perez Cruz v. Barr*, 926 F.3d 1128, 1138-45 (9th Cir. 2019) (arrest while executing search warrant); *Orhorhaghe*, 38 F.3d at 494-96 (what constitutes an arrest); *Zepeda*, at 730-31 (same). These cases make clear that "immigration stops and arrest [are] subject to the same Fourth Amendment requirements that apply to other stops and arrests." *Morales*, 793 F.3d at 215.

The district court wrongly concluded otherwise, contending that "border detentions" were exempt from the basic requirement of neutral review. SER 800. But how the Fourth Amendment applies at the physical *border* is irrelevant to this case. To be sure, Fourth Amendment standards may vary at the physical border and "its functional equivalents" (like airports), *Almeida-Sanchez*, 413 U.S. at 272, but that is equally true of *criminal* searches and seizures, *see United States v. Ramsey*, 431 U.S. 606, 616-19 (1977), so even at the border there is no special Fourth

Amendment rule for immigration arrests. More importantly, the interior of the country, where detainer arrests occur, is "wholly different" from the border. *Almeida-Sanchez*, 413 U.S. at 273. The Supreme Court has repeatedly rejected any suggestion that such interior immigration arrests are subject to a relaxed Fourth Amendment standard. *See id.* at 273-74 (rejecting government's argument that a lower Fourth Amendment standard applies "in the interior"); *Brignoni-Ponce*, 422 U.S. at 882-84 (rejecting government's attempt to "dispense" or "diminish" normal arrest rules); *Morales*, 793 F.3d at 215-17 (rejecting ICE's argument that normal Fourth Amendment rules do not apply to detainer arrests); *see also Lopez-Rodriguez*, 536 F.3d at 1019 (rejecting the idea that arrest rules applied with "less force in the administrative context").[23]

The *Gerstein* rule, like all other Fourth Amendment rules, applies with full force here because it protects everyone—U.S. citizens, noncitizens "lawfully within the country," and removable noncitizens alike. *Carroll v. U.S.*, 267 U.S. 132, 154 (1925). While the government has "broad" power to regulate immigration, "this

---

[23] The Supreme Court held in *INS v. Lopez-Mendoza* that the remedy of exclusion does not always apply in removal proceedings, just as it often does not apply in criminal proceedings. 468 U.S. 1032, 1050 (1984). But the exclusionary rule is only a *remedy* at trial, not a substantive Fourth Amendment rule. *See Davis v. United States*, 564 U.S. 229, 236, 244 (2011) (exclusionary rule "is a prudential doctrine" that presents "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated") (quotation marks omitted). *Lopez-Mendoza* did not announce any special Fourth Amendment rule for immigration arrests.

power cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens." *Brignoni-Ponce*, 422 U.S. at 884. As the facts of this case and countless others demonstrate, eliminating Fourth Amendment protections in the immigration context would subject U.S. citizens and residents to "unfounded invasions of liberty." *Gerstein*, 420 U.S. at 112.

2. The Fourth Amendment's history confirms that *Gerstein* applies to detainer arrests. *See Carroll*, 267 U.S. at 149 ("The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted."); *Gerstein*, 420 U.S. at 114-15 (same). At the time the Amendment was adopted, there was no general federal immigration scheme. But state laws commonly provided for civil removal proceedings, and for arrests to facilitate those proceedings. Critically, those laws required review by a neutral official before a person could be arrested during removal proceedings. *Cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 337-39 (2001) (relying on statutes enacted by "state legislatures"); *Wilson v. Arkansas*, 514 U.S. 927, 933 (1995) (same).

Examples are numerous. New Jersey, for instance, required a "warrant" issued by "two justices of the peace" before a person could be arrested pending a decision whether "to remove [the person] to the place of [the person's] former settlement." Act of Mar. 11, 1774, ch. 590, § 23, 1774 N.J. Acts 403 (capitalization altered). These arrests were "civil [in] nature," yet required a detached and neutral

officer to ensure that they were justified. *Hildreth v. Overseers of Poor of Hopewell Twp.*, 13 N.J.L. 5, 6 (1831). The other States that authorized arrests pending removal proceedings required neutral review as well. *See, e.g.*, Massachusetts, Act of Feb. 26, 1794, ch. 32, 1794 Mass. Acts & Laws 375, 379-82 ("warrant" issued by a "Justice" pending an "examin[ation]" concerning "removal"); Vermont, Act of Mar. 3, 1797, ch. XLVII, 1797 Vt. Acts & Resolves 370 ("warrant" issued by "two justices of the peace" so that a person can be "examine[d]" regarding "remov[al]"); New York, Act of Mar. 7, 1788, ch. 62, 1788 N.Y. Sess. Laws 732-33 (same); Georgia, Act of Feb. 10, 1787, 1787 Ga. Laws 40 (person may be "committed to the common [jail]" only "by warrant" of "Justices of the Court" pending "trial" on removability); WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE 343-44 (1795) (requiring a "[w]arrant of a justice to bring a person before him to be examined concerning" removal); JOHN F. GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF PEACE 356 (1784) (similar), available at https://bit.ly/2z4pR5o.[24] These statutes make plain that the founding generation considered a neutral determination of removability to be essential for civil immigration arrests. This consistent requirement was "woven . . . into the fabric of early American law." *Wilson*, 514 U.S. at 933.

---

[24] These statutes were the precursors to modern immigration law, as they provided for removal based on many of the same grounds as are now codified in the Immigration and Nationality Act, such as past criminal convictions and being a public charge. *See* 8 U.S.C. §§ 1227(a)(2), 1227(a)(5), 1182(a)(2), 1182(a)(4).

The district court identified only a single federal law from the founding era. *See* SER 796; An Act Concerning Aliens, ch. 58, 1 Stat. 570, § 1 (1798) ("Alien Friends Act"). For multiple reasons, however, the Alien Friends Act does not bear on the reasonableness of ICE's current detainer arrests.

First, the Alien Friends Act "was understood as a temporary war measure, not one that the legislature would endorse in a time of tranquility." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring in part). It "went unenforced," and by its own terms, it "lapsed a mere two years after its enactment." *Id.* at 1229. Second, and most important, the Act did not address arrests *pending removal proceedings*—the kind of arrest at issue in this case—where a neutral determination is needed to ensure that pretrial detention is justified. Rather, the Act only allowed arrests *after* a person was ordered removed, to carry out the removal—arrests not at issue in this case. *See* Alien Friends Act § 2 (allowing arrest only of those who had already "been ordered to depart"). At that point, there was no need for a determination of potential removability, because the person had already been ordered removed. Third, there was no general acceptance at the time that the Act was constitutional. To the contrary, "it was widely condemned as unconstitutional by Madison and many others." *Dimaya*, 138 S. Ct. at 1229, 1230 n.2 (Gorsuch, J.). In short, the Alien Friends Act does not reflect any acceptance of arrests and pretrial detention without neutral review.

Neither do more recent statutes. In *Abel v. United States*, on which the district court relied, the Supreme Court observed that Congress had authorized arrests "by order of an executive official," as opposed to a federal judge. 362 U.S. 217, 233 (1960). As explained, there is no dispute that probable cause can be assessed by a *neutral* executive official, like the immigration judges who reviewed probable cause in the 1980s and 1990s. *See supra* Part IV.A; *cf. Shadwick*, 407 U.S. at 350-51 (judge not required for criminal arrests). But the Court in *Abel* never suggested that the INS could dispense with neutral review altogether, or that Congress had left probable cause to the sole discretion of the very officers who carry out investigations and arrests. To the contrary, the Court emphasized that "an I.N.S. officer may *not* arrest and search on his own." *Abel*, 362 U.S. at 236 (emphasis added). Instead, an "independent" official had to review "deportability" prior to any arrest. *Id.* at 236-37. And the Court rejected any "difference[] between the procedural protections governing criminal and deportation arrests." *Id.* at 237. Indeed, none of the statutes cited in *Abel* purports to authorize arrest and pretrial detention without a neutral determination of probable cause.[25]

---

[25] Without exception, the statutes *Abel* cited simply authorize arrests by the head of the relevant agency, without specifying who must review probable cause. *See* Act of Oct. 19, 1888, ch. 1210, 25 Stat. 566 (arrests by "Secretary of the Treasury"); Act of Mar. 3, 1903, ch. 1012, § 21, 32 Stat. 1218 (same); Act of Feb. 20, 1907, ch. 1134, § 20, 34 Stat. 904 (arrests by "Secretary of Commerce and Labor"); Act of Feb. 5, 1917, ch. 29, § 19, 39 Stat. 889 ("Secretary of Labor"); Act of Oct. 16, 1918, ch. 186, § 2, 40 Stat. 1012 (same); Act of May 10, 1920, ch. 174, 41 Stat. 593 (same);

*Abel* did not examine the neutrality question any further, because Abel had waived any such challenge to his arrest, and so the Court's discussion of the arrest was dicta. *See id.* at 234 ("[P]etitioner's disavowal of the issue below calls for no further consideration."); *id.* at 230 (challenge to arrest "is not entitled to our consideration"). *Abel* was also decided before *Shadwick*, *Gerstein*, and other cases established what neutrality requires. But even in dicta, *Abel* clearly doubted that immigration officials could instigate arrests without a neutral determination of probable cause.

\*          \*          \*

ICE cannot discard the Fourth Amendment's core guarantee that a neutral official, not the police, must determine whether an arrest is justified. The detainer arrests at issue in this case are indefensible under *Gerstein*. As explained above, not only does ICE never seek neutral review, its detainer procedures *foreclose* people from even attempting to seek neutral review for multiple days, if not much longer. And detainer arrests have a uniquely troubling record of careless practices and frequent mistakes. The decision below should be reversed.

---

Internal Security Act of 1950, ch. 1024, § 22, 64 Stat. 1008 (arrest "upon warrant of the Attorney General").

## CONCLUSION

The injunction should be affirmed. The Court should reverse the grant of summary judgment to Defendants on the neutral determination claim and remand with instructions to grant summary judgment on that claim for Plaintiffs.

Respectfully submitted,

Dated: June 5, 2020

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

s/ *Jennifer Pasquarella*
Jennifer Pasquarella

*Attorneys for Plaintiffs--Cross-
Appellants--Appellees*

## STATEMENT OF RELATED CASES

There currently are no cases pending before this Court that are related to this action.

Dated: June 5, 2020

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

s/ *Jennifer Pasquarella*
Jennifer Pasquarella

*Attorneys for Plaintiffs--Cross-Appellants—Appellees*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 32(a)(5), 32(a)(6), 32(a)(7)(B), and 32(g) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1(a), I certify that the attached brief is in 14-point proportionally spaced Times New Roman font, and contains 16,106 words, as counted by my word processing program, exclusive of the portions of the brief excepted by Rule 32(f). Pursuant to Ninth Circuit Rule 32-1(e), a signed Form 8 also accompanies the attached brief.

Dated: June 5, 2020

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

s/ *Jennifer Pasquarella*
Jennifer Pasquarella

*Attorneys for Plaintiffs--Cross-Appellants—Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 5, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 5, 2020          ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

s/ *Jennifer Pasquarella*
Jennifer Pasquarella

*Attorneys for Plaintiffs--Cross-Appellants—Appellees*